*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0382p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DOROTHY CHAPPELL, Administratrix of the
Estate of Deceased Brandon McCloud,
                              *Plaintiff-Appellee,*

              *v.*

CITY OF CLEVELAND,
                                      *Defendant,*

PHILLIP HABEEB, Badge No. 381, Cleveland
Police Department; JOHN KRAYNIK, Badge
No. 1517, Cleveland Police Department,
                      *Defendants-Appellants.*

⎫
⎪
⎪
⎪
⎪
⎬  No. 08-4456
⎪
⎪
⎪
⎪
⎭

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-02135—Kathleen McDonald O'Malley, District Judge.

Argued:  October 6, 2009

Decided and Filed:  November 4, 2009

Before:  DAUGHTREY, SUTTON, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Stephen W. Funk, ROETZEL & ANDRESS, Akron, Ohio, for Appellants.
Terry H. Gilbert, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellee.  **ON BRIEF:**
Stephen W. Funk, Aretta Bernard, ROETZEL & ANDRESS, Akron, Ohio, W. Craig
Bashein, BASHEIN & BASHEIN CO., Cleveland, Ohio, for Appellants.  Terry H. Gilbert,
Gordon S. Friedman, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellee.

1

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  This action arises from the tragic shooting by police officers of a fifteen-year old boy, Brandon McCloud, in his own bedroom.  While conducting a protective sweep of a home in the early-morning darkness prior to executing a search warrant, the officers encountered a male suspect hiding in a bedroom closet.  When they ordered him to come out and show his hands, the suspect came toward the officers with a knife upheld.  When he ignored their commands to drop the knife and continued to move toward the officers in close quarters, they opened fire, killing him instantly.

The administratrix of McCloud's estate brought action against the officers under federal and state law, alleging the use of deadly force was excessive as the officers were not under imminent threat of serious bodily harm.  The district court denied the officers' motion for summary judgment, holding that they are not entitled to qualified immunity because there are genuine issues of material fact that preclude ruling, as a matter of law, that the officers' conduct was objectively reasonable.  Specifically, the court determined there is a factual dispute about the nature of the threat posed by McCloud, rendering it impossible to rule whether the officers' reaction was objectively reasonable.

We find the district court's reasoning, albeit thorough and well-articulated, to be erroneous in its ultimate conclusion.  Our review of the record convinces us that the material facts are not genuinely disputed.  Based on the record evidence, we conclude as a matter of law that the officers' conduct is not shown to have been objectively unreasonable.  For the reasons that follow, the denial of qualified immunity is reversed.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

On August 31, 2005, City of Cleveland Police Detectives Philip Habeeb and John Kraynik were investigating an armed robbery of a pizza-delivery person that had occurred that evening.  Upon learning about the circumstances of the robbery, the detectives immediately suspected Brandon McCloud, who lived in the vicinity of the robbery and had admitted committing 10-12 similar armed robberies in an interview with them some three

months earlier.  Once he had used a handgun, but in all other cases, he had used knives.  In fact, McCloud had been formally adjudicated a delinquent in connection with one of the robberies and had been sentenced to a short period of home detention, followed by probation.

After discovering physical evidence near the scene of the robbery suggestive of the same *modus operandi* McCloud had admitted using in the earlier robberies, the detectives obtained a warrant at about 3:00 a.m. on September 1, 2005, to search the home where McCloud lived with his grandmother, Dorothy Chappell, and uncle, Melvin Chappell.  The warrant authorized a search of the premises for evidence of the armed robbery, such as stolen property, weapons, and articles of disguise.  At about 5:00 a.m., after observing activity in the Chappell house, the detectives knocked on the front door, advised Melvin Chappell that they had a search warrant, and proceeded to conduct a protective sweep of the residence.  Chappell told the detectives that his mother was in the house getting ready for work, but he did not mention nephew Brandon McCloud.

The house was still dark; the detectives proceeded from one room to another with flashlights, firearms drawn.  While the detectives say they announced themselves several times as "Cleveland Police," others present at the house did not recall hearing this.  As the detectives approached what turned out to be McCloud's bedroom on the second floor, they found the door closed.  They barged into the small bedroom, each taking a position inside the room on either side of the "fatal funnel" formed by the opening into the room.  Across the dark room, they spotted McCloud hiding in the closet.  Their flashlights and firearms trained on him, they ordered him to come out of the closet and show his hands.  After first hesitating, McCloud turned and came out of the closet, holding a knife in his right hand with the blade pointing upward.  Ignoring their commands to drop the knife, McCloud continued to move quickly toward the detectives.  Believing they were threatened with imminent serious bodily harm, both detectives simultaneously opened fire, each striking McCloud with several shots, killing him instantly.  The entire encounter transpired in a matter of seconds.

Eight days later, during the Cleveland Police Department's investigation of the deadly force incident, both Detective Habeeb and Detective Kraynik stated that McCloud moved quickly or "lunged" toward them.  They both thought McCloud was attempting to

attack them and that they were in imminent peril of death or serious injury. Both believed McCloud would have stabbed one or both of them if they had not defended themselves. Twenty months later both detectives gave deposition testimony substantially consistent with their earlier statements.

This action was commenced in the Cuyahoga County Court of Common Pleas and removed to the District Court for the Northern District of Ohio on September 5, 2006. Dorothy Chappell, McCloud's grandmother and administratrix of his estate, asserted claims against the City of Cleveland and both detectives under 42 U.S.C. § 1983 for violation of McCloud's Fourth Amendment rights (unreasonable seizure), and under state law for wrongful death, assault and battery, and willful, wanton and reckless conduct resulting in death. After completion of discovery, defendants moved for summary judgment. All claims against the City of Cleveland were voluntarily dismissed with prejudice. Subsequently, the district court issued a 54-page opinion denying Habeeb's and Kraynik's motion for summary judgment, concluding they are not entitled to qualified immunity on either the federal or state law claims because there are outstanding questions of fact. This appeal timely followed.

## II.  JURISDICTION

A threshold question we must answer is whether the court has jurisdiction to hear this appeal. Ordinarily, the denial of a motion for summary judgment is an interlocutory ruling, not a "final order," and is not subject to immediate appeal. 28 U.S.C. § 1291; *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008). Yet, it is well-established that an order denying qualified immunity to a public official is immediately appealable pursuant to the "collateral order" doctrine. *Harrison*, 539 F.3d at 521; *Leary v. Livingston County*, 528 F.3d 438, 447 (6th Cir. 2008). This exception is narrow, however. Appellate jurisdiction exists "only to the extent that a summary judgment order denies qualified immunity based on a pure issue of law." *Leary*, 528 F.3d 447-48 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006)).

Plaintiff Chappell correctly points out that the district court's denial of qualified immunity is not based on a pure question of law, but on two clearly identified factual issues. Yet, the district court's characterization of the basis for its ruling does not necessarily dictate the availability of appellate review. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 402-

03 (6th Cir. 2007); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005). If, apart from impermissible arguments regarding disputes of fact, defendants raise purely legal issues bearing on their entitlement to qualified immunity, then there are issues properly subject to appellate review. *Livermore*, 476 F.3d at 403; *Estate of Carter*, 408 F.3d at 310. Hence, the district court's determination that there is a factual dispute does not necessarily preclude appellate review where, as defendants here contend, the ruling also hinges on legal errors as to whether the factual disputes (a) are *genuine* and (b) concern *material* facts. *See Scott v. Harris*, 550 U.S. 372, 378-80 (2007) (reversing denial of qualified immunity where lower court erred in finding genuine issue of material fact).

In *Scott*, the Eleventh Circuit was held to have erred by accepting the plaintiff's version of the facts as true even though that version was so conclusively contradicted by the record that no reasonable jury could believe it. *Id.* at 380-81. In other words, the court is not obliged to, and indeed should not, rely on the nonmovant's version where it is "so utterly discredited by the record" as to be rendered a "visible fiction." *Id.* The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence. *Leary*, 528 F.3d at 443-44. This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial. *Id.* at 444.

Defendants Habeeb and Kraynik contend that the district court committed legal error not unlike the error committed by the Eleventh Circuit in *Scott*. Specifically, they argue the district court erred as a matter of law (a) by treating the objective reasonableness of their use of force as a question of fact instead of a question of law; (b) by treating unsupported speculation that McCloud did not pose an imminent threat of serious harm as creating a "genuine" dispute; and (c) by treating evidence that the detectives did not announce themselves as "Cleveland Police" as going to a "material" fact issue even though it was not—per the "segmented analysis" that must be applied—part of the circumstances immediately preceding the use of deadly force.

For reasons more fully developed below, we agree with defendants on the latter two points. What's most important at this stage, however, is that defendants are not "merely

quibbling with the district court's reading of the factual record," *see Leary*, 528 F.3d at 441, but have identified purely legal issues that are, pursuant to the collateral order doctrine, subject to appellate jurisdiction. *Livermore*, 476 F.3d at 403. We therefore overrule Chappell's objection to this court's exercise of appellate jurisdiction.

## III.  ANALYSIS

### A.  Qualified Immunity Framework

Chappell alleges that Detectives Habeeb and Kraynik are liable under 42 U.S.C. § 1983 for using excessive force in responding to the discovery of her grandson in his bedroom and that killing him represents an unreasonable seizure in violation of his rights under the Fourth Amendment. In defense, the detectives have invoked qualified immunity, which if it applies, is a defense not just against liability, but against suit itself. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009). Hence, the immunity questions should be resolved as early in the litigation as possible. *Id.*

Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson*, 129 S.Ct. at 815. Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful. *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 129 S.Ct. at 815.

Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Plaintiff must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation. *Scott*, 550 U.S. at 377; *Harrison*, 539 F.3d at 517. If plaintiff fails to show either that a constitutional right

was violated or that the right was clearly established, she will have failed to carry her burden.  Moreover, to satisfy the second prong of the standard, plaintiff must show that the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right. *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004).  In determining whether the required showing has been made, the court has discretion to decide which of the two elements to address first. *Pearson*, 129 S.Ct. at 818.  The district court's decision is reviewed de novo. *Ewolski*, 287 F.3d at 501.[1]

## B.  Objective Reasonableness

There is no dispute regarding the correctness of the general legal standards employed by the district court in evaluating the § 1983 excessive force claim.  They are summarized by the district court as follows:

> It is axiomatic that individuals have a constitutional right not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989).  A claim that the government used excessive force during the course of a seizure is analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Id.*  In *Graham*, the Supreme Court established the test for analyzing objective reasonableness:
>
>> Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

---

[1]In response to plaintiff's state law claims for wrongful death, assault and battery, and willful, wanton and reckless conduct resulting in death, defendants moved for summary judgment, contending they are entitled to statutory immunity from liability as public employees and police officers under Ohio law, O.R.C. § 2744.03(A)(6).  Such immunity applies unless defendants are shown to have acted "outside the scope of [their] employment or official responsibilities" or "with malicious purpose, in bad faith, or in a wanton or reckless manner."  *Id.*  Plaintiff contends the immunity does not apply because defendants acted recklessly.

The district court analyzed the matter of state law immunity in a manner paralleling its qualified immunity analysis, and concluded that questions of fact precluded summary judgment on the state law claims as well.  While defendants challenge this ruling, too, both sides recognize that the availability of both federal qualified immunity and state law immunity depends on the correctness of the district court's finding of the existence of the very same questions of fact.  Hence, we address the issues, as the parties have, primarily through the lens of the federal qualified immunity analysis.

*Id.* at 396.  Application of this test "requires careful attention to the facts and circumstances of each particular case, including the [1] severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*   Further, the "reasonableness" of a particular use of force is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation," *id.* at 397.  Indeed, it is not for the Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Moreover, with regard to the constitutionality of an officer's use of deadly force, which also is subject to the objective reasonableness standard of the Fourth Amendment, the Supreme Court has noted that the use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 7, 11 (1985); *see Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (stating that "only in rare instances may an officer seize a suspect by use of deadly force"); *see also Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.").

ROA 87, Corrected Opinion and Order pp. 26-28 (footnote omitted).

Thus, plaintiff's excessive force claim requires a showing that the detectives' use of deadly force was objectively unreasonable.  The district court held that plaintiff made a sufficient showing to create a genuine issue of fact and forestall summary judgment. Defendants contend the district court misapplied the standard by viewing the question of objective unreasonableness as a question of fact rather than a question of law.

At the summary judgment stage, once the relevant set of facts is determined and all reasonable inferences are drawn in favor of the plaintiff, to the extent supported by

the record, the question whether the detectives' actions were objectively unreasonable is "a pure question of law." *Scott*, 550 U.S. at 381 n.8; *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008). Careful review of the district court's opinion reveals that the court did not erroneously treat this ultimate question as one of fact. Rather, the court found there to be a genuine fact issue as to whether McCloud posed a serious and immediate threat of harm. Indeed, *if* there is some evidence—more than a mere scintilla of evidence—that McCloud, through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created. The district court found there to be such a fact dispute and, resolving it in favor of plaintiff, concluded that defendants could be found to have used force that was "excessive," because it is well established, as a matter of law, that use of deadly force is objectively unreasonable absent probable cause to believe the suspect posed a serious threat of physical harm. *Garner*, 471 U.S. 7, 11. It was on this basis that the district court denied defendants qualified immunity.

For the reasons set forth below, we hold the district court erred in this conclusion, but not because it mistook a legal question for a factual question. Rather, its error lies in the determination that there is a genuine dispute at to whether McCloud gave the officers probable cause to believe he posed a serious threat of harm. But this is the subject matter of defendants' next objection. The present argument, that the district court committed legal error by treating the objective unreasonableness inquiry as a question of fact, is based on a mischaracterization of the district court's opinion and we reject it.

### C.  *Genuine* **Dispute of** *Material* **Fact?**

The district court correctly recognized that the first step in the qualified immunity analysis required the court to determine the relevant facts. *Scott*, 550 U.S. at 1774. The court also recognized that it was obliged to view the factual evidence in the light most favorable to plaintiff Chappell. The court went on to consider each of four factual

disputes asserted by plaintiff.  The court rejected the first two, but found merit in the latter two.

First, the court rejected the argument that the manner in which the detectives obtained and executed the search warrant (i.e., defendants' conduct leading up to but prior to the actual confrontation with McCloud in the bedroom) was relevant in assessing the objective reasonableness of their use of force.  The court correctly observed that this assessment is based on a "segmented analysis" of the totality of the circumstances facing the detectives at the time they made their split-second judgments immediately prior to using deadly force.  *Livermore*, 476 F.3d at 406.  Because it is the reasonableness of the "seizure" that is the issue, not the reasonableness of the detectives' conduct in time segments leading up to the seizure, the district court properly held that any fact issues relating to the issuance of the warrant and initial entry into the Chappell residence are immaterial.

Second, the district court addressed plaintiff's contention that there is evidence refuting the detectives' account that McCloud was holding the knife when they fired on him.  The court clearly explained why it found the forensic evidence insufficient to create a "genuine issue."  The court specifically cited the lack of affirmative evidence contradicting the detectives' account or indicating that the knife had been moved after the shooting.

Neither side has challenged the district court's conclusions on these first two asserted fact issues.  Third, the court considered the record evidence relating to whether McCloud's actions gave the detectives probable cause to believe he posed a threat of serious physical harm to them.  The court summarized the pertinent facts as follows:

> Upon entering the dimly lit bedroom, the Detectives noticed McCloud standing in a closet.  Detective Habeeb immediately instructed McCloud to come out of the closet and show his hands.  McCloud stepped forward, out of the closet and toward the Detectives. The distance between McCloud and the Detectives was approximately five to seven feet, and a mattress was lying on the floor between the closet and the Detectives. At the same time, McCloud raised his right hand which contained a knife, blade up.  The Detectives commanded McCloud to

> drop the knife; he did not do so; and they shot him ten times in a single volley.

ROA 87, Corrected Opinion and Order at 33-34 (footnote omitted). This summary of the extant record is accurate, but incomplete. Also relevant and undisputed, but conspicuously lacking from this summary, is the consistent testimony of both officers that McCloud continued moving toward them with the knife held up while ignoring their commands to drop the knife; and that they believed he was trying to attack them and, at a distance of less than seven feet, posed an imminent threat of serious bodily harm.

These are the relevant facts, as disclosed in the record. None of these facts are refuted by physical or circumstantial evidence and none are disputed by contrary testimony. In fact, there are no other witnesses who could testify to the circumstances facing the detectives in the bedroom immediately before they fired their weapons.

Based on these undisputed facts, defendants argue they are entitled to qualified immunity as a matter of law. They acknowledge they did not actually know McCloud's state of mind, but they knew he had admitted using knives in numerous armed robberies and they saw him quickly moving toward them with a knife. It all happened in darkness, in close quarters, within a matter of seconds. They insist that ultimately, McCloud's state of mind is irrelevant; they are entitled to qualified immunity unless their actions are shown to have been objectively unreasonable. They remind the court that the prohibition against second-guessing their actions based on 20/20 hindsight "carries great weight" where the events in question happened very quickly. *Untalan*, 430 F.3d at 315. Still, the fact that the situation unfolded quickly does not by itself legitimize the use of deadly force. *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008).

The district court denied qualified immunity, reasoning as follows:

> [T]he Detectives' position fails to take into account that, in the assessment of objective reasonableness, this Court must view the facts in the light most favorable to Chappell. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). When it does so, it is apparent that there is a genuine issue of material fact regarding the threat of danger posed by McCloud. McCloud was not charging the officers, a mattress separated McCloud from the Detectives, and McCloud was not waving the knife about in a

threatening manner–the knife was pointed upward and was not in a position to directly threaten the Detectives. Further, the evidence plausibly suggests that McCloud was merely complying with the Detectives' instructions. That is, he stepped out of the closest when instructed to do so and raised the knife in response to the command to show his hands. Although he did not immediately drop the knife when ordered to do so, there is no evidence indicating that McCloud had sufficient time to comply. Indeed, the evidence suggests that all of the events occurred in rapid succession.

ROA 87, Corrected Opinion and Order p. 38 (footnote omitted). The district court thus purports to have viewed the facts in the light most favorable to plaintiff's claim. In our opinion, however, the court also gave plaintiff the benefit of inferences and suppositions that are not only not supported by the record facts, but are directly contradicted by the record facts. The district court's reasoning is explicit and deserves careful scrutiny.

The district court noted there was no evidence that McCloud was "charging" the detectives. Yet, the detectives' statements that McCloud was continuing to move quickly toward them and had closed to within seven feet with knife held high are not contradicted. The detectives did not characterize McCloud's movement as "charging" them, but the semantic difference between "charging" and "moving quickly toward" is immaterial. The knife-wielding suspect was undisputedly moving toward the officers and had closed to within five to seven feet in a dark, cluttered, enclosed space. Both detectives were backed up against a wall in the small bedroom and there was no ready means of retreat or escape. Considering McCloud's stature (5'7", 165 lbs.) and the size of the knife (described and depicted in photograph as a standard "steak knife" with serrated edge), it is apparent that if the detectives had hesitated one instant, i.e., long enough to allow McCloud to take even one more step, they would have been within his arm's reach and vulnerable to serious or even fatal injury. These undisputed circumstances clearly support probable cause to believe that serious harm was imminently threatened and that use of deadly force in self-defense was justified.

The district court noted that a mattress separated McCloud from the detectives. This is accurate insofar as "separated" means that the mattress was between McCloud and the defendants. But the mattress was lying flat on the floor and did not pose much

of a barrier. The top surface of the mattress was no more than a foot higher than the floor. The mattress would thus have posed little impediment to a knife-wielding assailant of McCloud's stature. Thus, the mere presence of the mattress on the floor does not undermine probable cause to believe that serious harm was threatened.

The district court noted, based on the detectives' testimony, that McCloud was not waving the knife in a threatening manner. This hardly negates their testimony, however, that when he turned quickly and moved from the closet toward them, he displayed the knife (formerly concealed behind his body), held it up, and refused to release it as he continued to move toward them. The district court mused, because the blade was pointed upward, that it was not in a position to immediately threaten them. Yet, whether the knife was held in a position more conducive to slashing than stabbing can hardly be deemed to undercut the formation of probable cause to believe that serious harm was imminently threatened. Further, the district court's musing about the significance of the knife's position in McCloud's hand, speculation at odds with both officers' on-the-scene perceptions, represents exactly the sort of theoretical speculation that the courts are prohibited from engaging in. *Graham*, 490 U.S. at 396-97. It represents the impermissible substitution of the district judge's own personal notions—about what might have been, could have been, or should have been—in a "sanitized world of . . . imagination" quite unlike the dangerous and complex world where the detectives were required to make an instantaneous decision. *See Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000).

Finally, the district court deemed it "plausible" that McCloud had not actually refused to drop the knife, but was attempting to comply with the detectives' commands. The court observed that there is "*no evidence* indicating that McCloud had sufficient time to comply." ROA 87, Corrected Opinion and Order p. 38 (emphasis added). Thus, again, the district court relied on an inference drawn, not from the record evidence, but from a lack of evidence. Indeed, Kraynik testified that the whole encounter "happened real, real fast . . . in seconds." ROA 63-2, Kraynik dep. p. 117. Yet, from the time Habeeb, who entered the bedroom first, initially spotted McCloud in the closet, he had

sufficient time to make the following observations: that McCloud "presented a threat;" that he (Habeeb) needed to "put distance between us until I couldn't anymore;" that McCloud "turned and produced a knife;" that McCloud did not comply with Habeeb's multiple commands "to drop the knife;" that McCloud, upon exiting the closet, continued to move forward—"almost lunging"—"as if he were stepping onto the bed;" that McCloud had closed to within such close proximity of him that Habeeb thought he was "going to be killed." ROA 63-1, Habeeb dep. pp. 190-99. Although it may be fair to say there is no evidence that McCloud, in the unknown inner workings of his mind, had sufficient time to comply, the record shows there was sufficient time for the detectives to make observations of McCloud's actions—actions that, viewed objectively, strongly indicated his intentions were not innocent and compliant, but defiant and hostile. And ultimately, of course, the objective reasonableness of the detectives' conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit of hindsight. *Graham*. 490 U.S. at 397.

Furthermore, to withstand a properly supported motion for summary judgment, plaintiff must do more than rely merely on the allegations of her pleadings or identify a "metaphysical doubt" or hypothetical "plausibility" based on a lack of evidence; she is obliged to come forward with "specific facts," based on "discovery and disclosure materials on file, and any affidavits," showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Plaintiff has failed to carry this burden by adducing evidence refuting the detectives' account of the circumstances they confronted. Nor is there any substantial likelihood that the record could be improved in trial. The factual record on which the court must rule whether the detectives' conduct was objectively reasonable as a matter of law is fully developed.

The record affords no basis for holding that the detectives' conduct was objectively unreasonable under the circumstances they faced. There is no genuine issue of material fact. The district court reached a contrary conclusion not based upon

"specific facts" shown by discovery materials and affidavits, but based on what it considered to be plausible inferences drawn from a lack of conclusive evidence on McCloud's state of mind. To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her. *Scott*, 550 U.S. at 380-81 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). In *Scott*, the Court specifically rejected the dissent's argument that the duty to afford the nonmoving party the benefit of reasonable inferences required it to find a genuine fact issue based on an unsupported hypothetical. *Id*. at 380-81 n. 8 (concluding that once the relevant facts are determined and all inferences drawn in favor of the nonmoving party "*to the extent supportable by the record*," whether the circumstances reasonably warranted the use of deadly force presents a "pure question of law." (emphasis in original)).

The district court buttressed its reasoning on the basis of plaintiff's fourth asserted factual dispute, concerning whether McCloud even knew the intruders in his bedroom were police officers. The court reasoned that if the record showed that McCloud did not recognize the intruders as police officers, and this failure was attributable to defendants, then such evidence would bear on the reasonableness of their use of force. Earlier in its opinion, the court had correctly rejected plaintiff's argument that the manner in which the detectives executed the search warrant was relevant in assessing the objective reasonableness of their use of force. Yet, in evaluating the circumstances immediately prior to the seizure, the court believed it was obliged to "assume" that McCloud did not know the intruders were police officers based on its duty to read the record in the light most favorable to plaintiff. Yet again, ignoring for the moment the question of its relevance, the court's "assumption" is not based on the record evidence, but on a lack of evidence.

There is no direct evidence as to whether McCloud knew the two men who confronted him in the darkness of his bedroom were police officers. Both detectives testified that they announced themselves in a command voice as "Cleveland Police"

several times as they performed the protective sweep and made their way to McCloud's bedroom. ROA 63-1, Habeeb dep. pp. 166-68; ROA 63-2, Kraynik dep. pp 104-05, 113-14. Habeeb remembered making this announcement as he reached the top of the steps and entered into the hallway leading to McCloud's bedroom, and as he approached the closed door and pushed it open. ROA 63-1, Habeeb dep. at 171-72, 177, 181. Kraynik, too, remembered making the announcement as they reached and faced the closed door of McCloud's bedroom. ROA 63-2, Kraynik dep. at 114. Yet, as the district court observed, Melvin Chappell and Cleveland Police Officers Shawn Smith and Marcus Jones, who were stationed near but outside the house during the sweep, testified they did not hear the detectives announce themselves as "Cleveland Police."

This discrepancy, the district court reasoned, created a genuine factual dispute as to whether the detectives identified themselves and whether McCloud recognized them for who they were. Further, the court concluded the dispute is one of material fact, because the detectives' failure to identify themselves as they made their way through a dark house evidences not mere negligence, but recklessness, potentially justifying a jury finding that their eventual use of deadly force was not objectively reasonable. We disagree with both conclusions.

First, the three witnesses' failure to hear the "Cleveland Police" announcements does not refute the detectives' testimony that they in fact made several such announcements; it establishes only that the witnesses didn't hear the announcements. In other words, the discrepancy doesn't actually raise a *genuine* dispute of fact. Indeed, even though, as the district court observed, the conditions were such that Melvin Chappell and Officers Jones and Smith may have been in a position to hear the announcements, it is likely they were paying attention to other matters. Specifically, Melvin Chappell and Jones were talking with each other on the porch. ROA 73, Jones dep. pp. 18-20. And Smith was occupied talking with Dorothy Chappell in the rear driveway. ROA 63-5, Smith dep. pp. 11-12. So, the fact that all three witnesses did not notice the detectives announcing themselves does not necessarily impugn the veracity of the detectives' account.

Second, even if a genuine fact dispute were deemed presented, it is not material, because the events before the shooting are not a factor in determining whether the detectives had probable cause to use deadly force once they entered the bedroom. *Livermore*, 476 F.3d at 406-07 (holding that evidence of recklessness by one officer in events leading up to shooting was immaterial in evaluating objective reasonableness of shooting officer's decision to use deadly force in the situation he faced at time of shooting); *Claybrook v. Birchwell*, 274 F.3d 1098, 1104-05 (6th Cir. 2001) (applying temporally segmented analysis to possibly erroneous actions taken by officers and finding error that preceded shooting segment to be immaterial); *Boyd*, 215 F.3d at 599 (applying segmented analysis to excessive force claim in determining which facts were material); *Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir. 1996) (holding the time frame is crucial and evaluating reasonableness of officers' use of deadly force at the time of the seizure, irrespective of their prior unreasonable conduct in creating the circumstances).

Notwithstanding this case law, the district court deemed *Yates v. City of Cleveland*, 941 F.2d 444 (6th Cir. 1991), to be controlling. In *Yates*, the Sixth Circuit affirmed the denial of qualified immunity where an officer, without identifying himself, entered into the dark hallway of a house in which he could hear shouting and threatening language and, upon encountering occupants, opened fire, seriously injuring one. According to the officer, he used deadly force because he had been pushed, kicked and beaten and felt vulnerable to further attack. The shooting victim's version was different. He stated that the officer tripped while moving backward and then purposefully shot him after he recognized the intruder as a policeman, raised his hands, and said, "Don't shoot." *Id.* at 445-46. Recognizing that these two versions presented a classic factual dispute, the *Yates* court held the reasonableness of the shooting was a jury question. In dictum, the court observed that "[a]n officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent." *Id.* at 447.

In applying *Yates*, the district court overlooked the fact that the *Yates* ruling was driven by two obviously conflicting versions of the facts and instead focused on the court's comment about the unreasonableness of the officer's conduct. The district court viewed this dictum as suggesting that unreasonable conduct by an officer in events leading up to the shooting may be a legitimate factor in assessing the reasonableness of the subsequent shooting. The court reasoned that the more recent case law's emphasis on a time-segmented analysis of the officers' conduct has no impact on application of *Yates* to this case because here, as in *Yates*, the detectives' failure to identify themselves as police officers was not part of an earlier time segment, but was integral to the circumstances leading directly to the use of deadly force:

> Here, taking the facts in the light most favorable to Chappell, the Detectives' objectively unreasonable actions similarly may have caused McCloud to take the potentially threatening response of picking up a knife and hiding in the closet, because he believed the Detectives were intruders. And, like the violent response to the officer's actions in *Yates*, this response to the Detectives' actions by McCloud in turn precipitated the Detectives' use of deadly force.

ROA 87, Corrected Opinion and Order p. 42.

The district court's analysis suffers from several defects. First, the court gives inordinate weight to what is clearly a "thing said in passing" in *Yates*. Second, whereas in *Yates*, it was undisputed that the officer did not identify himself, here it is undisputed, as explained above, that the officers *did* identify themselves.

Third, it was not McCloud's actions of picking up a knife and hiding in the closet that precipitated the use of deadly force. If the detectives had fired immediately upon finding McCloud hiding in the closet with a knife, their actions would certainly be held objectively unreasonable. Instead, it was McCloud's undisputed actions of quickly advancing toward the officers while holding the knife up and refusing to drop it that precipitated their use of deadly force. Even assuming the detectives had not effectively identified themselves as police officers and that McCloud still failed to recognize them as such even as they stood in his bedroom with flashlights and handguns trained on him, McCloud had a momentary opportunity to consider how to react to their commands.

After pausing for a moment in the closet, McCloud chose to comply with the command to come out of the closet. He chose to comply with the command to show his hands. He chose not to comply with the command to drop the knife. And he chose to continue advancing toward the officers with the knife held high until he reached a point within five to seven feet of them before they fired in self-defense.

In *Yates*, in contrast, the assailants had no reason to believe, in the midst of an angry, violent setting, that the particular intruder they encountered in the dark hallway was a police officer. Yet, according to the *Yates* plaintiff's version, it was only after he realized that the intruder was a policeman and after he raised his hands in submission and said, "Don't shoot," that the officer responded with deadly force, at a time when he was not threatened with serious harm.

Thus, even assuming the *Yates* dictum was not overruled by *Livermore*, *Yates* is distinguishable on its facts. Most importantly, it is undisputed that Detectives Habeeb and Kraynik were confronted with what they perceived to be an imminent threat of serious harm. Irrespective of any errors that contributed to the circumstances, they were entitled to defend themselves unless their perception is shown by some evidence not to have been reasonable. Considering what the record shows they knew at the moment of McCloud's attack, their use of deadly force to defend themselves in close quarters against a knife-wielding assailant who had closed to within five to seven feet and was still advancing toward them cannot be deemed objectively unreasonable. *See Livermore*, 476 F.3d at 406-07 (expressly rejecting the argument that officers can be liable despite the reasonableness of a seizure if they recklessly created the circumstances which required use of deadly force).

For these reasons, the putative dispute as to whether the detectives identified themselves as they conducted the sweep is not a dispute of material fact and represents no grounds for denying defendants qualified immunity.

In sum, plaintiff has failed to present a genuine issue of material fact on her claim that defendants violated McCloud's Fourth Amendment right to freedom from unreasonable seizure. At best, plaintiff has presented grounds for speculation that

defendants misread her grandson's innocent intentions when he came out of the closet and advanced toward them with knife in hand. Yet, qualified immunity protects officers from liability for mistakes of law and fact. Plaintiff has failed to adduce facts demonstrating that defendants, in potentially misinterpreting McCloud's actions, were plainly incompetent or deliberately violated his rights when they acted in self-defense. Plaintiff has thus failed to carry her burden under the first prong of the qualified immunity analysis of demonstrating that defendants violated McCloud's constitutional rights. She has failed to demonstrate that they are not entitled to qualified immunity. Moreover, there being insufficient evidence of a constitutional violation, defendants, in effect, have no need of qualified immunity and are actually entitled to summary judgment as matter of law. *Dunn*, 549 F.3d at 353.[2, 3]

## IV. CONCLUSION

The shooting death of a fifteen-year old boy in his own bedroom at the hands of police is a deplorable tragedy. With the benefit of hindsight, it appears the detectives might have executed the search warrant differently, so as to minimize the risk of a violent confrontation. Yet, assessing the undisputed facts through the lens of governing Sixth Circuit case law compels the conclusion that the split-second decision of Detectives Habeeb and Kraynik to use deadly force in self-defense is not shown to have been objectively unreasonable. For the reasons set forth above, we conclude that the district court's denial of defendants' motion for summary judgment must be **REVERSED** and the case must be **REMANDED** to the district court for entry of **JUDGMENT** in favor of the detectives on all of plaintiff's claims, under federal and state law.

---

[2]Because plaintiff has failed to make the requisite showing of the violation of a constitutional right, we need not address the second prong of the qualified immunity analysis and determine whether the asserted right was clearly established in a particularized sense at the time of the fatal shooting.

[3]Based on the same analysis, we conclude there are no genuine issues of material fact and that defendants are similarly entitled to immunity from liability in connection with plaintiff's claims under state law. Inasmuch as plaintiff has failed to demonstrate that defendants' conduct was objectively unreasonable, it follows that she has also failed to demonstrate that defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner," such as is required to avoid statutory immunity under Ohio law. O.R.C. § 2744.03(A)(6)(b); *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002).