NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0047n.06

No. 15-3562

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 26, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SARAH CURRY, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| WILLIAM COTTON, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: GILMAN, WHITE, and STRANCH, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant William Cotton (Cotton), a Hamilton County Sheriff's Deputy, seeks interlocutory review of the district court's denial of his motion for summary judgment asserting qualified and statutory immunity in this action alleging excessive force under 42 U.S.C. § 1983 and state-law battery. The district court held that disputed issues of fact preclude summary judgment. We **AFFIRM in part** and **DISMISS in part**.

**I.**

This case arises out of events that occurred the night of November 24-25, 2012, outside the Inner Circle Night Club in Cincinnati, Ohio. After getting into a verbal altercation with other patrons, Plaintiff-Appellee Sarah Curry (Curry) and her boyfriend Jesus Aleman (Aleman) were asked to leave the club. Kasey Igwegbe (Igwegbe), the head of security at the club, stated that

Curry was aggressive towards bar staff and other patrons and that she directed racial slurs at him when he asked her to leave the club.[1]

That evening, Deputy Cotton and Deputy Roy Berry (Berry) were working a security detail at the club.[2] According to Curry, while she and Aleman waited outside the club for someone to retrieve Curry's coat, Cotton "demanded" that Curry and Aleman go to their vehicle. (Curry Aff., PID 270, ¶ 12.) Curry replied that she "did not know why [she] was being asked to leave or why Deputy Cotton was being so demanding." (*Id.*, ¶ 13.) According to Cotton, Curry would not comply with his request, was combative and belligerent, and shouted racial slurs at Cotton and Berry, who are African American. At the plea hearing where she pleaded guilty of resisting arrest, Curry admitted being intoxicated that evening, and "swip[ing] at" and becoming combative with Cotton. (*Id.*, PID 123, 127–28.)

---

[1] In his appellate brief, Cotton cites only to his motion for summary judgment to support his facts. The facts therein are largely supported by CD and DVD exhibits that were filed with the district court and include surveillance video from the club, dashboard camera videos from police cruisers, and recorded interviews conducted as part of the Sheriff's Office's use-of-force investigation. On appeal, Cotton filed with the court only the club surveillance and dashboard camera videos and did not designate the interview recordings in the appellate record or file them with this court. In affidavits, Cotton, Deputy Roy Berry, and Igwegbe attested that the information they conveyed in these interviews is true and correct. Because the recordings were filed in the district court and because Curry has not argued we should not consider them, we will consider the recordings. In addition to the recorded interviews, Cotton and Berry both gave written statements as part of the Sheriff's Office's use-of-force investigation. In their affidavits, both attested that those statements were "a true and accurate representation" of what occurred. (Cotton Aff., PID 185,¶¶ 4–5; Berry Aff., PID 188, ¶¶ 4–5.) The district court considered these statements under the public records exception to the hearsay rule, because Cotton and Berry had attested to their accuracy and Curry did not challenge their admission into evidence, and because Curry was not prejudiced by their inclusion. Since Curry has not contested the admission of these statements into the record on appeal or challenged the district court's consideration of these statements, we also consider them.

[2] Cotton and Berry worked this detail in their capacities as Sheriff's Deputies.

Surveillance cameras outside the club captured the initial interaction between the parties.[3] (*See generally* Ex. 2, Surveillance Videos.[4]) The footage shows Curry waving her arms and apparently yelling at Berry and swiping at him before Cotton walks behind her, puts his arm around her neck, and throws Curry to the ground. Curry and Cotton continue to struggle, with Curry alternately kicking, squirming, and staying still. Cotton then stands up, at which point Curry continues to kick and squirm, but appears to be quickly subdued. At one point, Curry crawls away from Cotton and stands up; she then appears to swing her arms at him, but he pushes her away. Curry appears to continue yelling and waving her arms at Cotton, who at one point pushes her up against a table, and later up against a railing with his hand on her neck. The footage ends with Cotton walking Curry to the parking lot; he is standing behind her with his arm around her neck, in what he refers to as the "escort position," (Cotton Br. 3). Curry was not handcuffed, nor did she appear to be bleeding when she walked out of view of the cameras. Curry contends that she was not resisting when Cotton walked her to the parking lot.

The parties dispute the events occurring immediately after Cotton and Curry were out of view of the surveillance cameras. Curry alleges that once in the parking lot, Cotton immediately cuffed her hands behind her back, then "beat [her] to the point [of] bleeding profusely." (Curry Aff., PID 272, ¶¶ 38–39.) Curry's affidavit suggests this happened before other officers responded to the scene. Curry alleges the back part of her arm was exposed while her hands were cuffed behind her back, and photos show "marks left by [Cotton's] baton blows." (*Id.*, ¶ 40.) Photos taken after the incident show Curry with blood on her face, apparently from a cut

---

[3] Curry contends that she had an earlier verbal altercation with Cotton in the parking lot, where he blamed her for cutting off his vehicle on the way to the club. Cotton asserts that this interaction occurred between Curry and Berry.

[4] Cotton filed with the court two surveillance videos. The videos depict the same events from different angles. Neither video has sound.

on her forehead, extensive bruising on one arm, and additional cuts and bruises on her arms and body.

Cotton disputes this account and contends that after he walked Curry to the parking lot, she began resisting again and grabbed at his collar, at which point he grabbed Curry and they both fell to the ground. Berry and Igwegbe corroborate this account. While Curry was on the ground, Berry came over to help put her in handcuffs. Cotton admitted that, to get control of Curry, he struck her with his baton twice in the ribcage and once on her arm. Berry stated that he grabbed Curry's wrist and bicep to force her arm behind her back and that Cotton did the same. Berry also stated that when Curry got up, she had a cut on her head. Cotton contends that when he and Berry saw Curry had cut her forehead, Berry called for assistance.

Igwegbe told the Sheriff's Office that there was no further altercation or physical force used after Curry was in handcuffs. Cotton stated that "once [Curry] was placed in cuffs, she began to struggle and move around on the ground," and when she tried to get up again, she was told to sit until the squad car arrived. (Cotton Interview, 12:47-13:02.) He also stated that when the first responder arrived, Curry "[went] after" him, and would not sit down even after he instructed her to do so. (*Id.*, 13:02-13:14.) At Curry's plea hearing, Cotton testified that once other officers arrived at the scene, Curry "attacked one city officer while she was cuffed." (Plea Hr'g Tr., PID 121.) Then-Sergeant Brian Stapleton (Stapleton) similarly stated that when he arrived at the scene, "Curry was irate, she was beyond verbal control and could not follow along with any instruction that [he] provided her." (Sheriff's Office Report, PID 71; *see also* Stapleton Aff., PID 192, ¶ 11 (stating the report is a true and accurate representation of what he observed and what was reported to him).) Berry stated that Curry would not allow the officers to assess

the cut on her head and that "she continued to be disruptive." (Berry Investigation Statement, PID 67.)

Dashboard cameras from two Cincinnati police cruisers that responded to the scene depict some of what occurred once they arrived. The videos generally show Curry sitting on the ground with her hands cuffed behind her back, alternately rocking back and forth and moving along the ground slowly while seated, and appearing to yell. (*See generally* Ex. 12, Dashboard Camera Videos.)[5] A few times, an officer attempts to hold Curry in place, but most of the time the officers either stand near her or walk slowly alongside her. Although Curry appears to try to stand, she is not successful. At times, the camera pivots to follow Curry around. At certain points, officers out of the camera's view are heard telling Curry to stop moving around, and to "get away from [the] car," (Dashboard Camera 2, 04:49-05:04), and asking her to stop talking, (*id.*, 08:00-08:03). Curry is heard saying, "Help me," (*id.*, 04:11-04:14), and asking "What's going on?" (*id.*, 08:03-08:07). Later, an officer is heard asking Curry for certain biographical information; although not all of Curry's answers are clear, she can be heard saying, "I want somebody please," "My head hurts," "What's going on," and "Where is everybody." (*Id.*, 09:15-10:15.) Curry is again heard saying "My head hurts," (*id.*, 10:52-10:54), and "Somebody help me," (*id.*, 10:57-11:02), to which an officer responds, "You didn't let the fire department treat you," (*id.*, 11:05-11:09).

A Cincinnati Fire Department Report from that night states, "[patient] was very combative and would not sit still for fire to evaluate." (PID 83.) The hospital records report that when Curry arrived at the hospital, she was belligerent, "combative and abusive with the staff,"

---

[5] There are two videos in this exhibit. The video labeled "8300" is referred to as "Dashboard Camera 1" and the video labeled "8346" as "Dashboard Camera 2."

and required sedation and restraints. (PID 87.) Curry claims that she was sedated because when she arrived at the hospital, she was upset and asked the hospital staff to take pictures of her. The hospital records from that night state that Curry had a "1.5 cm laceration" on her forehead, note a clinical impression of "[a]lcohol intoxication," (PID 88), and report lab results showing Curry's "[e]thanol level was 225," (PID 89). When Stapleton interviewed Curry the following evening, he observed she had a black eye, "redness and swelling on her left elbow," abrasions on her knuckles, and stitches on her forehead. (Sheriff's Office Report, PID 73.) Records from Curry's hospital visit two days after the incident show diagnoses of head and chest wall contusions, a left-elbow sprain, and multiple abrasions.

As a result of this incident, Curry was charged with assaulting a peace officer, disorderly conduct while intoxicated, and resisting arrest. She pleaded guilty of resisting arrest and the court sentenced her to one year of community control and alcohol treatment. Stapleton conducted the Sheriff's Office's internal use-of-force investigation following this incident and concluded that Cotton's use of force was consistent with department policy and state law.

On August 7, 2013, Curry filed the instant action against Cotton, alleging a Fourth Amendment excessive-force claim under 42 U.S.C. § 1983 and a state-law battery claim. Cotton filed a motion to dismiss and for summary judgment, arguing, inter alia, that he is entitled to qualified immunity on Curry's § 1983 claim and statutory immunity on her state-law battery claim. The district court denied the motion. Cotton filed this interlocutory appeal, arguing the district court erred in denying Cotton qualified and statutory immunity.

## II.

We must first determine whether we have jurisdiction to hear this appeal. In general, denial of summary judgment is "not a 'final order,'" and thus may not be immediately appealed.

*Chappell v. City of Cleveland*, 585 F.3d 901, 905 (6th Cir. 2009); *see also* 28 U.S.C. § 1291.

However, pursuant to the collateral-order doctrine, the denial of qualified immunity to a public

official is immediately appealable "to the extent that it turns on an issue of law." *Quigley v.

Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013) (quoting *Estate of Carter v. City of Detroit*,

408 F.3d 305, 309 (6th Cir. 2005)).[6] The appellant must, however, accept the facts as alleged by

the plaintiff in the light most favorable to the plaintiff. *See Estate of Carter*, 408 F.3d at 309–10.

Thus, when a party appeals a district court's denial of qualified immunity, we review only

challenges to "the district court's *legal* determination[s,]" or to "a *legal* aspect of the district

court's factual determinations, such as whether the district court properly assessed the [legal

consequences of] incontrovertible record evidence." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d

604, 609 (6th Cir. 2015).

Curry argues that we should dismiss this appeal because Cotton's arguments rest on

disputed facts. However, even where an appellant improperly disputes facts, the court has

jurisdiction if the appellant also raises a legal issue. *Chappell*, 585 F.3d at 906; *see also Quigley*,

707 F.3d at 680. If a party raises both factual and legal challenges, "we must 'separate an

appealed order's reviewable determination (that a given set of facts violates clearly established

law) from its unreviewable determination (that an issue of fact is 'genuine').'" *Roberson v.

Torres*, 770 F.3d 398, 402 (6th Cir. 2014) (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)).

The district court determined that there is clearly established law in this circuit holding

that officers may not use violent physical force against a suspect who has been subdued, and that

---

[6] We have held that statutory immunity claims under Chapter 2744 of the Ohio Code are also immediately appealable under the collateral-order doctrine because Ohio law "provides immunity from suit, as opposed to immunity simply from liability." *Chesher v. Neyer*, 477 F.3d 784, 793–94 (6th Cir. 2007). Consequently, Cotton's claim of statutory immunity is also immediately appealable under the collateral-order doctrine.

there is a genuine dispute of fact whether Cotton used violent physical force against Curry after she was physically restrained; consequently, the district court denied summary judgment. Cotton does not challenge the district court's legal conclusion that an officer may not use violent physical force against a suspect who has been subdued; however, he argues that the district court erred in ending its analysis at the point Curry was handcuffed because uncontroverted evidence shows Curry continued to resist arrest even after being handcuffed, and that she was not subdued at that point. Thus, although Cotton disputes the facts, he also raises an issue of law. As discussed further below, we consider Cotton's legal arguments, but dismiss this appeal insofar as he disputes the facts.

## III.

### A.

We review de novo a district court's determination that a defendant is not entitled to qualified immunity. *See Chappell*, 585 F.3d at 907; *Spurlock v. Thompson*, 330 F.3d 791, 796 (6th Cir. 2003). Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A plaintiff bears the burden of showing that an official is not entitled to qualified immunity. *Chappell*, 585 F.3d at 907. To do so, she "must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation." *Id.* A right is clearly established if a reasonable official in defendant's position would have known that his conduct violated plaintiff's constitutional rights. *See id.*; *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir. 2015). "Because we do not have

jurisdiction over factual issues, 'a defendant must concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Quigley*, 707 F.3d at 680 (quoting *Estate of Carter*, 408 F.3d at 309–10). Thus, "[i]n reviewing immunity defenses, we determine whether the facts alleged by plaintiff[], if proved, would overcome the asserted defenses." *Spurlock v. Satterfield*, 167 F.3d 995, 1000 (6th Cir. 1999).

Curry alleges that Cotton violated her constitutional rights by using excessive force during her arrest. Such claims are "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Police have "the right to use some degree of physical coercion or threat thereof to effect" an arrest. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (citation omitted). In determining whether an officer's use of force was objectively reasonable, we carefully consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013). "Under this circuit's existing case law, there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009). Consequently, "it is clearly established in this circuit that 'the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional.'" *Id.* (citation omitted); *see also Bultema v. Benzie Cty.*, 146 F. App'x 28, 37 (6th Cir. 2005) ("[W]e have . . . held for more than twenty years that it is clearly established in this circuit that 'a totally

gratuitous blow' to a suspect who is handcuffed and offering no resistance violates the Fourth Amendment.").

Cotton does not quarrel with this precedent, but instead contends that the district court erred in ending its reasonableness analysis at the point that Curry was in handcuffs because an officer may use reasonable force on a suspect until the suspect is *subdued*, regardless whether she is handcuffed. However, this argument mischaracterizes the district court's holding. Although Cotton argued in the district court that Curry resisted arrest in the parking lot while he was trying to place her in handcuffs, and noted that Curry continued to be combative with paramedics and officers on the way to the hospital by screaming and cursing, Cotton did not argue that using force against Curry after she was handcuffed was reasonable. Instead, he argued that no further force was used on Curry after she was handcuffed; and, in response to Curry's claim that she was beaten after being handcuffed, he argued only that Curry's account was not credible and was contradicted by other record evidence. Thus, the district court did not hold that a reasonableness analysis ends when a suspect is handcuffed, but rather had no reason to consider that issue given the facts and arguments before it.

Attempting to frame the question as an issue of law, Cotton argues for the first time on appeal that uncontroverted evidence—the Cincinnati police cruiser footage and Cotton's testimony at Curry's plea hearing—demonstrates that even after she was handcuffed, Curry continued to resist arrest and present a danger to others, and therefore Cotton's use of force against her was reasonable until she was actually subdued. However, even accepting that the use of force on a handcuffed suspect who continues to pose a danger may be reasonable, the evidence that Cotton points to is neither uncontroverted nor conclusive.

Curry disputes Cotton's account of what happened after she was handcuffed, arguing that although she resisted arrest initially, "she conceded to [Cotton's] authority as she was lead [sic] off into the parking lot, where she was handcuffed," and "[i]t was at this point that she was beat [sic] mercilessly." (Curry Br. 13.) In response to Cotton's motion for summary judgment, Curry attested in an affidavit that Cotton "walk[ed] [her] out to the parking lot with no resistance, out of view of the cameras," where she was "immediately placed in handcuffs with [her] hands behind her back," at which point "Deputy Cotton continued to beat [her] to the point [she] was bleeding profusely." (Curry Aff., PID 272, ¶¶ 38–39.) And, in her summary judgment briefing to the district court, Curry specifically argued that "she was already handcuffed *and was not resisting* while Cotton continued to use force against her." (PID 263) (emphasis added).

None of Cotton's evidence conclusively proves otherwise. The Cincinnati police cruiser footage shows Curry sitting on the ground with her hands behind her back, alternately rocking back and forth and scooting along the pavement slowly as officers alternately walk around with her or stand near her. Although the video shows an officer once or twice put a hand on Curry's shoulder to try to keep her in place, or back away from her slowly as she moves towards him, neither Curry's nor the officers' actions in this footage show that Curry presented a danger at that point.

Moreover, the cruiser video footage does not cover the timeframe in which Curry alleges she was beaten. Curry contends that Cotton beat her after putting her in handcuffs and before other officers arrived on the scene. But the dashboard camera footage was taken after other officers arrived. Further, although the video footage shows an officer taking photos at the scene, and those photos show Curry already injured, the footage does not show what caused Curry's injuries. Additionally, Cotton's testimony that Curry "attacked" a city officer while in handcuffs

similarly addresses Curry's conduct after other officers arrived, not when she was allegedly beaten. Thus, there are genuine factual disputes that preclude summary judgment on the qualified immunity issue.

To the extent Cotton's appeal raises the legal question whether the facts, viewed in the light most favorable to Curry, show he did not violate a clearly established constitutional right, we affirm the district court's denial of Cotton's motion. To the extent Cotton argues that he did not use force while Curry posed no threat, we dismiss the appeal because it raises a factual, rather than a legal, challenge.

**B.**

Cotton also challenges the district court's denial of his claim of statutory immunity against Curry's state-law battery claim. Ohio law grants statutory immunity to government officials unless the employee's actions were conducted, inter alia, "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code Ann. § 2744.03(A)(6)(b). Under Ohio law, "'[m]alice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Cook v. Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995). "'Bad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.*

Cotton argues that the district court erred in finding a dispute of fact about whether his actions were malicious because Curry was not subdued even after being handcuffed. For the reasons stated above, however, the district court properly concluded that genuine factual disputes preclude granting Cotton statutory immunity as a matter of law.

**IV.**

For these reasons, we **AFFIRM in part** and **DISMISS in part**.