**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0333n.06

Nos. 17-3384/3475

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jul 10, 2018
DEBORAH S. HUNT, Clerk

PATTI STEVENS-RUCKER,                        )
Administrator of The Estate of Jason         )
White, Deceased,                             )
                                             )
    **Plaintiff-Appellee**              )
    **Cross-Appellant,**                )
                                             )   **ON APPEAL** FROM THE
v.                                           )   UNITED STATES DISTRICT
                                             )   COURT FOR THE SOUTHERN
CITY OF COLUMBUS, OH;                         )   DISTRICT OF OHIO
SERGEANT JOHN FRENZ, (#5141);                )
OFFICER DUSTIN MCKEE, (#2611),               )   **OPINION**
                                             )
    **Defendants-Appellants**           )
    **Cross-Appellees.**                )
                                             )

BEFORE: NORRIS, BATCHELDER, and STRANCH, Circuit Judges.

**NORRIS, J., delivered the opinion of the court in which BATCHELDER, J., joined, and STRANCH, J., joined in part. STRANCH, J. (pp. 20–25), delivered a separate opinion concurring in part and dissenting in part.**

**ALAN E. NORRIS, Circuit Judge.** In the early morning hours of November 17, 2013, Ashley Cruz was awakened in her Hilliard, Ohio, apartment by a shirtless man wearing a camouflage hat and jeans. It was raining, and he was soaked. He held a large kitchen knife and was clearly confused—apparently believing that he had entered his own apartment. Within the hour he was dead—shot several times by Columbus police officers who had converged on the apartment complex in response to a 911 call from Ms. Cruz.

With the benefit of hindsight, no one disputes that the events of this evening were tragic. The man, Jason White, was a 32-year-old, decorated veteran who had served in Iraq. Although he

had exhibited certain mental health issues, such as bipolar disorder, he was "deemed not to be an imminent risk of danger to self or others" just days before his death. Nothing in the record suggests that the officers who responded were aware of these issues.

This appeal stems from a suit filed by Patti Stevens-Rucker, the administrator of his estate. Her complaint alleges that the two Columbus police officers who shot Mr. White used excessive force in doing so and were then deliberately indifferent to his serious medical needs as he lay dying; their actions, or lack thereof, violated the Fourth and Fourteenth Amendments, respectively. Plaintiff also contends that the City of Columbus failed adequately to train or supervise its officers and had customs and/or policies that ratified constitutional violations. Lastly, the complaint includes Ohio-law claims for wrongful death, assault and battery, and intentional infliction of emotional distress.

Defendants filed a motion for summary judgment, which the district court granted in part and denied it in part. *Stevens-Rucker v. City of Columbus*, 242 F. Supp. 3d 608, 634 (S.D. Ohio 2017). This appeal followed.

**I.**

In an affidavit, Ashley Cruz described the events that triggered White's fatal encounter with Columbus police. Around 5 a.m., she was sleeping on her living room couch when she heard someone enter her apartment. (She had left her door unlocked so that her boyfriend could enter when he returned.) She sat up and saw White. He "was holding a large kitchen knife in his right hand, and he was sliding his left hand across the top of the knife's blade." After turning on the light, she asked him to leave. She offered White food, water, and a coat. Rather than reply directly, he asked her why she was in his home. She explained that she lived there. He then walked in and out of her apartment. According to Cruz, he "looked confused, and I thought he was under the

influence of drugs or alcohol." Eventually, he left long enough for her to lock the door. When White returned and began to try the handle, she called 911.

That night Columbus police officer Don Alderman[1] was alone in his patrol car when he received a call dispatching him to Cruz's apartment. According to his deposition testimony, he remembered "hearing . . . that the caller called 911 and said that there was a man with a knife banging on her door." While driving to the scene, Alderman received an update that the man was attempting to re-enter Cruz's apartment, which transformed the incident into a possible burglary and a "two-officer" run.

When Alderman arrived at the scene, he encountered White who was not holding a weapon. Alderman approached with his gun drawn. The two men faced each other at a distance of fifteen to twenty yards. When asked to show his hands, White complied. He turned around when asked to do so but dropped his hands to his sides. Alderman saw knives in his back pocket and ordered White to put his hands back up. Instead, White simply turned around. As Alderman put it, "It's hard to put into words, but he's almost looking around and not really even looking at me, but almost just kind of looking through me it seemed. It didn't seem like he was too concerned with anything I was commanding him to do."

At this point, Alderman removed his Taser while keeping his gun trained on White. He ordered him to the ground. When White failed to comply, Alderman deployed his Taser. At that moment, White did not have a knife in his hands. On impact, White fell backwards to the ground. Alderman put the Taser away and approached White. According to Alderman, "As soon as he fell back and hit the ground, it seemed almost immediately as he hit the ground, he was popping back

---

[1] Officer Alderman was originally named a defendant in this action. He was later dismissed by joint stipulation.

up." When he got back up, White had a knife in his hand. Here is Alderman's description of what happened next:

> It was all kind of one fluid motion of getting up and coming forward with the blade pointing up and coming directly towards me. . . . [T]hat's when I fired my shots.

In all, Alderman fired four times. None of the bullets struck White, who then ran away. Alderman did not pursue him because he was shaken up and wanted to wait for backup.

For his part, Sergeant John Frenz, who remains a party to this appeal, was in his office when he heard radio traffic that Alderman had the suspect at gunpoint. He ordered a "10-3" run, signaling that there was an officer in trouble. He then left the station and headed to the apartment complex where he encountered responding officers Jeffrey Kracht and Dustin McKee. Frenz directed them to set up a perimeter to apprehend White. The two officers left Frenz and fanned out. According to his deposition testimony, Frenz observed White "at the corner, crouched down, hiding his hands, kind of peering around the corner." Having heard that Alderman had fired shots at White because he had a knife, Frenz drew his weapon. He shined his flashlight in White's direction and identified himself. Frenz approached and ordered White to show his hands. Instead White stood up and moved around to the south side of the building where there was a small area partially enclosed by a fence which contained air conditioning units. There were gaps between the fence and the apartment building at either end of the enclosure.

White crouched inside the enclosure as Frenz approached. Once again, Frenz ordered White to show his hands. In response, White stood up; there was a knife in his hand. The men were about twenty feet apart although separated by the fence. Frenz knew that there were other officers in the area and he caught a glimpse of one, who turned out to be Kracht. Seeing that Frenz had White at gunpoint, Kracht holstered his gun and withdrew his Taser. According to Kracht's deposition testimony, he fired it at White, who was unaffected and instead began to move toward

the gap in the fence that was closest to Frenz. For his part, Frenz testified that he felt that White was coming at him. Before White was able to leave the enclosure, Frenz fired three shots. One of them hit White in the shoulder. At the time Frenz fired, he estimates that he was six to eight feet from White, albeit on the other side of the fence.

Dustin McKee, the other officer who remains a party to this appeal, was about thirty yards away when he heard Frenz shoot. He testified that he saw the blood spatter from White's back when he was shot. Despite being wounded, White fled with the three officers—McKee, Frenz, and Kracht—all in pursuit. McKee left the others and looped around in another direction. He eventually saw White emerge from a breezeway and head north. McKee followed. With the three officers in pursuit, McKee elected to slow, crouch, and fire two shots at White. One of those shots may have struck White who continued to flee. After turning through a breezeway, McKee encountered White, who had stopped and was facing the officer. He still held a knife. The two were about fifteen feet apart. Though his gun was drawn, McKee's finger was not on the trigger.

According to his deposition testimony, McKee felt that White was close enough to strike at him. He aimed at White's "center mass" and fired two shots. Before the shots, White was staring at McKee with a blank expression. As McKee put it, "[T]hat's the first time I'd actually made eye contact with Mr. White . . . and there was no expression whatsoever." White collapsed after the shots. McKee fired two more times:

> He was laying on his left side kind of with his arm underneath, his left arm underneath almost in front of him, and was trying to post himself back up, meaning push up to get himself back off the ground.

One of the shots hit White in the chest. According to an affidavit sworn by McKee, "[t]he time between the second and third set of shots may have been only a second or even fractions of a second."

After these shots, a number of officers converged on the scene. Officer Kracht took the knife from White's hand, rolled him onto his stomach, and placed handcuffs on him. Although no officer attempted to provide emergency medical assistance, an audio recording indicates that the rescue squad was summoned and a medical squad arrived about fifteen minutes later. Emergency medical personnel checked White for vital signs but, finding none, pronounced him dead.

The district court granted summary judgment on a number of claims and denied it on others. Defendants appealed the partial denial of their motion, and plaintiff filed a cross-appeal challenging those claims on which judgment was granted.

### III.

**Qualified Immunity**

We turn first to the invocation of qualified immunity by Officers Frenz and McKee. If they are entitled to qualified immunity, then the claims of municipal liability, which hinge on a finding that plaintiff's decedent suffered a constitutional violation, would necessarily fall away. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (noting that municipal § 1983 liability arises only when an "action pursuant to official municipal policy of some nature caused a constitutional tort"). As outlined earlier, the plaintiff alleges that the defendant officers violated White's constitutional rights in two respects: first, that they used excessive force against him in violation of the Fourth Amendment; second, that they then were deliberately indifferent to his serious medical needs in violation of the Fourteenth.

Standard of Review

We review the denial of summary judgment on the grounds of qualified immunity *de novo*. *Mitchell v. Schlabach*, 864 F.3d 416, 420 (6th Cir. 2017). We view the facts in a light most favorable to plaintiff and draw all favorable inferences in her favor. *Id.*

Qualified Immunity and Excessive Force

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Excessive force claims are analyzed under an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). In *Graham*, the Supreme Court explained that the application of the reasonableness standard in this context "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citation omitted). In addition, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In short, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397. "In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm,'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Untalan*, 430 F.3d at 314). Finally, "plaintiff

must show that the right was clearly established in a 'particularized sense,' such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right." *Chappell*, 585 F.3d at 907 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004)). Consonant with that requirement, the United States Supreme Court recently reminded lower courts "'not to define clearly established law at a high level of generality.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *City and Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015)).

With these precepts in mind, we turn to the actions of the two officers individually.

*Officer Frenz's Use of Force*

The district court concluded that Sergeant Frenz was entitled to qualified immunity for his use of deadly force against White. *Stevens-Rucker*, 242 F. Supp. 3d at 625. We agree with the analysis of the district court with respect to Sergeant Frenz's use of force and summarize that reasoning here before turning to the arguments advanced by plaintiff on appeal.

As our case law requires, the district court addressed the three factors that *Graham* instructs us to consider when determining whether the use of deadly force was reasonable: 1) severity of the crime; 2) whether the suspect was resisting arrest or fleeing; and 3) whether the suspect posed an immediate threat to others, including the officer involved. *Graham*, 490 U.S. at 396; *Mullins*, 805 F.3d at 765.

With respect to the first consideration, the district court concluded that "at the time Frenz encountered White, based on the information he had at the time, it was reasonable for Frenz to believe that White had committed aggravated burglary under Ohio Revised Code § 2911.11(B) and aggravated assault under Ohio Revised Code § 2901.11(A)(2), two potentially violent crimes." *Stevens-Rucker*, 242 F. Supp. 3d at 622.

Turning to whether White was resisting or fleeing, the court made the following observations:

> [T]his factor weighs in favor of the use of force by Frenz. Again, Frenz was aware that Alderman had some sort of confrontation with White, that White then ran away from Alderman and into a new [next door] apartment complex, that White continued to refuse to follow Frenz's commands, and that White then, at a minimum was attempting to flee out of the enclosure [containing the air conditioning units] with a knife in his hand.

*Id.* at 622-23.

The final consideration—the immediacy of the danger posed by White—presents a closer question. We quote the district court's analysis of plaintiff's position at some length because she advances the same arguments to this court:

> Plaintiff repeatedly states that "a reasonable fact finder could find that Jason White was merely moving away from Frenz and Kracht and posed no imminent deadly or serious threat to anyone." However, there is no evidence that rebuts the testimony of both Kracht and Frenz that White first moved in Frenz's direction holding a knife, refusing orders to drop the knife and show his hands. While it is certainly possibly [sic] that White was merely attempting to leave the enclosure, it is undisputed that his first move—once confronted by Frenz and Kracht—was a move toward Frenz. In the Sixth Circuit, in the absence of overt statements by White to the officers, White's actual motives for his movements are not relevant to this inquiry because they are not known to the reasonable officer at the time of the incident. *See Murray-Ruhl*, 246 F. App'x at 350 ("the subjective intent of the victim—unavailable to the officers who must make a split-second judgment—is irrelevant to the question whether his actions gave rise to a reasonable perception of danger."); *see also United States v. Serrata*, 425 F.3d 886, 905 (10th Cir. 2005) (holding the victim's "state of mind is irrelevant, as the force would have been excessive regardless of [the victim's] subjective state of mind."); *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997) (finding that "evidence outside the time frame of the shooting is irrelevant and prejudicial" and excluding the victim's subjective intent to commit suicide by police).
>
> . . . .
>
> As to immediacy, the Court agrees with Defendants that *Lopez v. City of Cleveland* is inapplicable to Frenz's shooting. In *Lopez*, the Sixth Circuit analyzed a case where police officers approached a machete wielding suspect who was speaking to a family member. 625 F. App'x 742, 744 (6th Cir. 2015). The officers alleged that they saw the decedent make a move toward the family member with the machete raised over his head in a threatening manner. *Id.* However, there were

three non-officer witnesses who alleged that the decedent turned away from the family member, that he only raised the machete to threaten himself, that he never raised it at all, and/or that he did not turn in any direction. *Id.* The Sixth Circuit found that there was a question of fact whether the decedent had in fact moved towards the family member while holding the machete. *Id.* at 746. Accordingly, the Court decided that "[t]hose disputes go to the heart of whether it was reasonable for Defendant Officers to use deadly force." *Id.* at 747. Notably, the Court did not hold that force would be unreasonable if the officers' version of the facts was correct. In this case, there is no question of fact about White's movement immediately before Frenz fired, meaning the *Lopez* decision is unhelpful in determining whether Frenz's shooting was reasonable.

Plaintiff argues Frenz was never in danger because White was not within striking distance at the time Frenz shot, that Frenz had cover from the fence, and that there were twenty to thirty officers in the area. There is nothing in the record which rebuts Frenz's testimony that White was six to eight feet from Frenz when Frenz fired. Plaintiff does not cite to any case law which requires that a victim be within striking distance before an officer fires his weapon. In fact, in *Chappell*, the Sixth Circuit explicitly held that a knife wielding suspecting moving toward an officer with the knife, "held up while ignoring their commands to drop the knife; and that they believed he was trying to attack them and, at a distance of less than seven feet, posed an imminent threat of serious bodily harm." *Chappell*, 585 F.3d at 910. The decedent in *Chappell* also had a mattress between him and the officers but the Sixth Circuit applied qualified immunity anyway, noting that the mattress would have posed "little impediment to a knife-wielding assailant." *Id.* at 911. The Court finds that those circumstances are sufficiently similar to the case at hand to warrant a finding of reasonableness.

. . . .

Based on the similarities in *Chappell*, even if Frenz's use of force was unreasonable, when the Court is in a legal gray area, "the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight." *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015) (citing *al-Kidd*, 563 U.S. at 131). Accordingly, Frenz is entitled to qualified immunity for his use of force against White . . . .

*Id.* at 623-25 (footnote and citations omitted).

In her brief to this court, the plaintiff takes issue with this reasoning. She argues that the "severity of the crime" factor does not support an inference that Frenz knew, as the district court stated, that White attempted to cause physical harm to Alderman by means of a deadly weapon. On the contrary, she contends that the record only indicates that Frenz knew that White had been

banging on Ms. Cruz's door with a knife in hand, that Alderman fired shots at him, and that Alderman was uninjured.

Even if we limit Sergeant Frenz's knowledge to those factors listed by plaintiff, the severity of the crime is enough to justify the use of force. As the district court pointed out, Frenz had probable cause to believe that, at the very least, White had committed aggravated burglary and was armed with a knife while doing so.

Much closer, of course, is the question whether Sergeant Frenz was in immediate danger of death or bodily injury at the time that he used deadly force. We must construe facts in favor of the non-moving party. Here, plaintiff reminds us that a fence separated White and Sergeant Frenz. As the record below clearly established, Kracht and Frenz were at opposite ends of the enclosure. White fled through the opening closest to Frenz. The parties dispute whether he was fleeing or charging Frenz. What is undisputed is that, as White began to flee, he moved closer to Frenz. If, as the district court concluded, Frenz could reasonably have believed that a knife-carrying person was charging at him, his fear of immediate death or injury was justified. However, if, as plaintiff urges, it should have been clear to Frenz that White was simply trying to run away, then the use of force becomes much more problematic.

As she did the district court, plaintiff asks us to look to *Lopez*, *supra*, rather than *Chappell*, *supra*, in making our decision. In the latter case, the suspect was emerging from a dark, enclosed bedroom with a knife at a distance of less than seven feet; in the former, the suspect was on the porch with a machete and it was sufficiently disputed as to whether he posed an imminent danger to his family. As plaintiff sees it, the latter scenario is closer to that faced by her decedent.

We affirm based upon the reasoning of the district court. Sergeant Frenz was faced with an individual carrying a knife coming in his direction. He knew that person had already confronted

another officer and that shots had been fired. Given the deference that we accord the split-second decisions which officers are sometimes called upon to make, *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017), the facts—even when viewed in the light most favorable to plaintiff—justify the grant of qualified immunity.

*Officer McKee's Use of Force*

We turn now to the firing of six shots by Officer McKee and consider whether they constituted a constitutionally impermissible use of force that deprives him of qualified immunity. The parties and the district court analyzed the six shots as three separate incidents of two shots each despite Officer McKee's testimony that only eight to ten seconds elapsed between the first and last shot. As explained below, we view the final four shots through a different lens.

Once again, we begin with the analysis by the district court. While we recognize that our review is *de novo*, our independent assessment of the record convinces us that the district court's description of the events leading to Mr. White's death is thorough and balanced. We part company only with the conclusions to be drawn from these events.

As recounted at the outset, the first two shots fired by McKee occurred while he, Sergeant Frenz, and Officer Kracht were chasing White through an apartment complex after he had just run from the air conditioning enclosure where he had been wounded by Sergeant Frenz. While all three officers were in pursuit, McKee had taken a different route and they were not side by side. With White about 20 to 25 feet ahead, McKee crouched and fired two shots, one of which likely struck White in the back. The court reached the following conclusion with respect to the threat posed by White to Officer McKee or others with respect to this shooting:

> This case comes down to whether a reasonable officer would believe—or that reasonable officers could differ—that White was an immediate threat to others in the area. The Supreme Court has cautioned that an officer's actions may fall "in the 'hazy border between excessive and acceptable force.'" *Brosseau*, 543 U.S. at

200–01 (quoting *Saucier*, 533 U.S. at 206). This is such a case. In *Plumhoff*, the Supreme Court found the use of force reasonable during a high speed chase where, "at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Plumhoff*, 134 S. Ct. at 2022. Thus, the Court finds that even though there were no other officers or civilians in the immediate vicinity of White, McKee's first use of force was reasonable because reasonable officers could differ on whether or not White posed an immediate danger to those in the area. *Mullins*, 805 F.3d at 765. Further, this case falls into the sort of gray area that means it would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and thus that the right was not clearly established. *Saucier*, 533 U.S. at 202.

*Stevens-Rucker*, 242 F. Supp. 3d at 626. We adopt this reasoning and affirm the grant of qualified immunity to Officer McKee with respect to these initial two shots.

We now turn to the district court's analysis of the final four shots fired by Officer McKee after he emerged from a breezeway and was confronted by Mr. White standing in an open area. In addressing that confrontation, the district court elected to break the four shots into two separate volleys of two shots each. It granted qualified immunity to McKee for firing the first two of the four shots but denied him qualified immunity for firing the final two.

Officer McKee fired at White after the latter had stopped running. The two men were fifteen feet apart and White now faced McKee while still grasping the knife and staring "blankly" at him. McKee aimed at White's "center mass" and fired. Having chosen to separate the four shots into two distinct incidents, the district court analyzed the first of these as follows:

> The Court finds that based on the evidence and the Court's obligation not to impose hindsight on split-second decisions, a reasonable officer could reasonably have believed that White was an immediate threat even though he was fifteen feet away and standing still. Although other officers were in the area, there is no evidence that McKee was aware where any of the other officers were located other than Kracht and Frenz, who he knew were behind him but at an unknown distance. Accordingly, their general presence in the area does not show that any were close enough to truly provide support should White have decided to charge McKee. Further, although it is now clear that McKee could have retreated because he was in an open space, there is no evidence that he was aware of his surroundings at that time. It was dark, in an apartment complex and a suspect who had two

- 13 -

previous confrontations with officers had stopped running to face him while holding a knife. This is an extremely close case but the Court finds that although McKee's second shooting may not have ultimately been necessary, it was not an unreasonable use of force. McKee is entitled to qualified immunity for this round of shots . . . .

*Stevens-Rucker*, 242 F. Supp. 3d at 627-28. We agree with this reasoning to the extent that it grants qualified immunity with respect to the first two of those final four shots, but disagree with the district court's view that the evidentiary record supports separating the final four shots into two distinct incidents. The district court correctly concluded that the record indicates that the first two shots fired by McKee were separated in time from the four subsequent shots; however, it failed to point to any evidence that the final four shots were likewise separated by such a significant gap in time that they must be viewed as distinct incidents requiring individualized analysis. Rather, the uncontroverted evidence supports a conclusion that the final four shots were fired in such rapid succession that they constituted a single event. Officer McKee testified in his deposition that only eight to ten seconds elapsed from the time that he fired his first shot at Mr. White until he fired his final shot. Moreover, according to his affidavit, "only a second or even fractions of a second" separated his final two shots from his third and fourth shots. This timeline is uncontroverted by the record and leads us to conclude that McKee's firing of his weapon constituted two, not three, distinct incidents: the first includes the initial two shots, the second the final four.

With respect to the final two shots, the district court—once again focusing on the threat to the officer or the public—reached the following conclusion:

The Court disagrees that a reasonable officer would have felt immediately threatened by a knife wielding suspect on the ground ten to fifteen feet away suffering from at least one known gunshot. Regardless whether White was prone or attempting to push himself up, McKee was in an open field facing a man on the ground with a knife and rather than retreat to a safe position, take note of his surroundings, or call for backup, McKee shot White again while White was on the ground and fatally wounded him. Accordingly, Plaintiff has presented sufficient

> evidence, which if believed, could support a finding that McKee's third set of shots were unreasonable.

*Stevens-Rucker*, 242 F. Supp. 3d at 629.

In the view of the district court, if Officer McKee was behaving like a reasonable police officer in the second or even fractions of a second separating his fourth shot from his final two, he would have weighed the following: that White was suffering from a gunshot wound; the viability of standing his ground, retreating, or calling for backup; that White was trying to push himself up; that he and White were separated by only ten to fifteen feet; and that White had twice failed to give himself up despite being confronted by an armed officer. The district court concluded that McKee, acting as a reasonable police officer, would have taken all of this into account and, after doing so, could not have reasonably believed that he was threatened by White. But the conclusion is untenable in light of McKee's unrebutted affidavit testimony that only a second or even less elapsed between the third and fourth shots and the fifth and sixth shots.

Based upon the uncontroverted evidence, what the district court characterized as separate second and third salvos was, in our view, but a single shooting consisting of four shots fired within a second of one another. That was not enough time for Officer McKee to stop and reassess the threat level between the shots. He continued to use his firearm to stop what he justifiably perceived as an immediate threat to his safety.

For these reasons, we conclude that Officer McKee is entitled to qualified immunity in all respects, and we therefore reverse the judgment of the district court to the extent that it conflicts with this decision.

Qualified Immunity and Deliberate Indifference to Serious Medical Needs

The district court denied defendants Frenz and McKee qualified immunity for plaintiff's claim that they violated White's right to due process under the Fourteenth Amendment by showing deliberate indifference to his serious medical needs.

"Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994)). A showing of deliberate indifference thus has objective and subjective components. *Phillips v. Roane Cnty.*, 534 F.3d 531, 539 (6th Cir. 2008). The objective component is that the plaintiff must "show the existence of a 'sufficiently serious' medical need." *Id.* (quoting *Farmer*, 511 U.S. at 834). The subjective component, by contrast, "requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the [detainee], that he did in fact draw the inference, and that he then disregarded that risk.'" *Id.* at 540 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

The district court relied upon *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005), for the proposition that the Fourteenth Amendment imposes a duty upon officers to both summon and provide medical care. In *Owensby*, officers incapacitated plaintiff by first striking him with a baton and then placing him in handcuffs. *Id.* at 600. After he was handcuffed, plaintiff's face was doused with mace at close range. Certain officers continued to strike plaintiff before placing him in the back of a police cruiser. Six minutes passed before officers checked on plaintiff and discovered that he was not breathing. *Id.* at 601. Only then did officers call the rescue squad, which arrived four minutes later. The coroner later ruled the death a homicide resulting from police intervention.

Defendants rely upon their affidavits to explain why they did not render aid at the scene. Sergeant Frenz stated, "Because I believed more thoroughly trained medics would be arriving quickly, I did not believe it was necessary for me or any of the other CPD officers on the scene to provide First Aid, CPR, or any type of medical attention to the suspect." In addition, he did not believe that his assistance would have saved White's life. Officer McKee's affidavit reads essentially verbatim.

Defendant officers point us to a recent decision of this court, *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017), in which we observed that "an officer does not act with reckless disregard when he immediately summons help and then focuses on his own safety." In that case, officers had been summoned to an ongoing burglary. One officer mistakenly shot the victim who fled his dwelling holding the gun of his assailant. However, because the officer feared others were armed, and the victim appeared to be dead, he did not render aid himself. We stated, "[h]e did not violate the Constitution by failing to render aid when doing so appeared both dangerous and futile." *Id.* Our defendants read *Thomas* to establish that an officer need not render aid if doing so would be futile. At the very least, they contend that the contours of that right were not clearly established at the time of White's death.

As these abbreviated summaries of *Owensby* and *Thomas* make clear, they are at best instructive with respect to the question before us. Unlike in *Owensby*, defendants did not ignore the physical condition of plaintiff for critical minutes while he lay dying. Nor did they face a danger to their own safety, as in *Thomas*, which prevented them from rendering immediate assistance. Rather, the record indicates that defendants did not personally perform CPR or provide other medical attention to White because they believed that trained medical assistance had been summoned and that their individual intervention would not have helped.

Under these circumstances, do defendants' actions (or lack thereof) represent a violation of White's right to due process under the Fourteenth Amendment? We conclude that they do not and therefore reverse the district court on this claim. In reaching this conclusion, we look to cases from the Ninth Circuit. In *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986), the court addressed whether a jury instruction should have stated that "the fourteenth amendment due process clause requires officers to render CPR when a pretrial detainee in their custody is in need of CPR." It held that no such instruction was required: "We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances." *Id.* Rather, "[d]ue process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured . . . by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Id.*; *see also Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090, 1099 (9th Cir. 2006) (holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR") (citing *Maddox*). The logic that underlies these cases makes sense: an officer is charged with providing a detainee with prompt medical attention. However, this attention does not require the officer to intervene personally. Imposing an absolute requirement for an officer to do so ignores the reality that such medical emergency situations often call for quick decisions to be made under rapidly evolving conditions. As long as the officer acts promptly in summoning aid, he or she has not deliberately disregarded the serious medical need of the detainee even if he or she has not exhausted every medical option. *See Phillips*, 534 F.3d at 540 (observing that the subjective component of a deliberate indifference claim includes deliberate disregard for substantial risk to detainee).

We therefore hold that defendants Frenz and McKee are entitled to qualified immunity with respect to plaintiff's Fourteenth Amendment claim.

**Municipal Liability for Constitutional Violations**

As mentioned earlier, local government units can be held liable for § 1983 claims only if a constitutional violation has occurred. *Monell*, 436 U.S. 691. Because we hold that defendants Frenz and McKee did not violate Mr. White's constitutional rights, the *Monell* claims against the City of Columbus also fail.

**Immunity for State-Law Claims**

In their briefs to this court, the parties agree that plaintiff's state-law claims against defendants Frenz and McKee survive or fail based upon the resolution of the federal claims against them. Because we have held that the individual defendants are entitled to qualified immunity with respect to the federal claims against them, judgment in their favor with respect to the state-law claims is also proper. As the district court also correctly held, the City of Columbus is likewise entitled to state-law immunity. *Stevens-Rucker*, 242 F. Supp. 3d at 633-34 (citing Ohio Rev. Code § 2744).

**III.**

The judgment of the district court is **affirmed in part** and **reversed in part** as outlined in this opinion. Judgment is **granted** in favor of defendants as to all claims.

**JANE B. STRANCH, Circuit Judge, concurring and dissenting.**  I agree that Officer Frenz's use of force and Officer McKee's first and second volleys of gunfire are entitled to qualified immunity and therefore concur with the majority on those issues.  I do not, however, agree that the law and the facts of this case compel the result reached by the majority with respect to Officer McKee's third use of force and the Plaintiff's deliberate indifference claim. I respectfully dissent on those issues.

The majority opinion today holds that police can shoot and kill a non-fleeing suspect who is already gravely wounded even when there is no immediate threat to the officers or the public. It reaches that conclusion by construing Officer McKee's final four shots as a single and continuous use of force rather than as the last two uses of force, as was argued by Stevens-Rucker and necessarily conceded by the Officers.  The district court also held that Officer McKee used force in "three distinct circumstances and . . . each must be segmented and analyzed individually." I think this case should have been analyzed on the facts argued by the parties and found by the district court.  *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 n.1, 611 (6th Cir. 2015) (holding that in qualified immunity cases, we usually "defer to the district court's factual determinations" and "ideally . . . look no further than the district court's opinion for the facts and inferences cited expressly therein").

Like the district court and the briefing of the parties, I believe our precedent compels us to disaggregate McKee's three spates of gunfire.  *See Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007) (explaining that it is "crucial for the purposes of this inquiry to separate [the Officer's] decision-points and determine whether each of his particular decisions was reasonable"); *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (holding that in use of force cases we "analyze excessive force claims in segments").

By lumping the second and third shootings together, the majority obscures material issues of disputed fact. But even if we assume that it might be appropriate and plausible to accept an interpretation of the facts that "only a second or even fractions of a second" separated the two shootings, Officer McKee's own testimony supports a finding that sufficient time elapsed between the two volleys to allow him to deliberate and reassess whether force was required. Describing the circumstances, McKee explained that White "was laying [sic] on his left side kind of with his arm underneath, his left arm underneath almost in front of him, and was trying to post himself back up, meaning push up to get himself back off the ground." McKee also refers to these shots as the second in a series of "double-taps," not as an unpunctuated, single set of four shots. Thus, this record reveals a quintessential dispute of material fact that renders summary judgment inappropriate, particularly in an appeal of the denial of qualified immunity.

But even if we undertake review and apply our precedent to the third volley of shots by Officer McKee, we should affirm the district court's denial of qualified immunity. First, I acknowledge that there may be instances in which the police could lawfully use lethal force to subdue an already wounded suspect. For example, in *Boyd v. Baeppler*, 215 F.3d 594, 603 (6th Cir. 2000), we held that an officer was entitled to qualified immunity when he fired on a prone, wounded suspect. But there, the officers' explanation of the events was supported by eyewitness and forensic evidence in the record, and the suspect was *pointing a pistol* at the officers. *Id.* We made it clear, moreover, that the question of law at issue was "about the conduct of police acting in self-defense, not about pursuit of a fleeing felon or suspect." *Id.* at 602–03. We also addressed the situational use of deadly force in *Bouggess*, applying an objective assessment of the danger posed. 482 F.3d at 890. We concluded, "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others,

deadly force is *not* justified." *Id.* at 896 (collecting cases). Properly reviewing that district court's determinations, we denied qualified immunity.

Also applicable here is our precedent addressing the concerning fact that in many qualified immunity cases involving the use of deadly force, the witness most likely to contradict a defendant officer's story is the person killed by the officer. In such situations, we "may not simply accept what may be a self-serving account by the police officer." *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (internal quotation marks and citation omitted). Instead, we "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.*

Drawing all reasonable inferences in favor of the nonmoving party, as we must, McKee's testimony indicates that he had sufficient time to evaluate White's movements, discern his intent to get back up, and elect to fire again. Reasonably inferring that McKee possessed sufficient time to deliberate regarding whether additional force was necessary, a jury could have concluded that, under the circumstances, the use of such force was unreasonable. The threat posed by White is an order of magnitude less than the threat posed in cases where a suspect has a firearm. White was armed only with a knife, lay 15 feet from officers in an open field, and there were no civilians in the immediate vicinity. Numerous other officers were descending on the scene to reinforce McKee and their arrival was imminent. It is simply not a plausible argument that McKee was in immediate danger when he delivered the fatal shots. The majority's decision to depart from precedent and lump the second and third shootings together therefore distorts both the governing precedent and the factual reality.

With respect to the Plaintiff's deliberate indifference claim, the majority opinion relies on the 30 year-old decision of *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986), for the proposition that the Due Process Clause does not establish "an affirmative duty on the part

of police officers to render CPR in any and all circumstances." That may be but subsequent decisions clarify that when law enforcement officers fail to provide CPR not "because they were busy with other tasks" but because they were merely waiting for more trained individuals, "a trier of fact could conclude that, looking at the full context of the situation, officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated . . . deliberate indifference." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1083 (9th Cir. 2013). In other words, even if there is not a per se duty to administer CPR, some circumstances create a duty for first responders to render such aid. As in *Lemire*, the officers here neither feared for their own safety nor were they busy with other tasks. In spite of their training as first responders, they elected to leave White handcuffed, facedown, and dying as opposed to rendering aid. Because I think that the Constitution requires more of officers in these circumstances, I cannot support the majority opinion's conclusion with respect to the Plaintiff's deliberate indifference claim.

This police shooting also points to a broader, troubling pattern. After serving his country in the war in Iraq, Jason White returned to the United States as a decorated veteran suffering from significant mental health problems. On the day the police shot him, he was suffering an acute mental health incident. Although we lack comprehensive data, "[i]t is safe to say that a third to a half of all use-of-force incidents involve a disabled civilian." David M. Perry & Lawrence Carter-Long, *The Ruderman White Paper on Media Coverage of Law Enforcement Use of Force and Disability* 7 (2016). People with mental illness are 16 times more likely to be killed by police. *See* Liz Szabo, *People with mental illness 16 times more likely to be killed by police*, USA Today (Dec. 10, 2015, 4:05 am) https://www.usatoday.com/ story/news/2015/12/10/people-mental-illness-16-times-more-likely-killed-police/77059710/.

This is a societal problem and police are often caught in an unenviable position on the frontlines of mental health emergencies. Our criminal justice system, moreover, serves as the de facto treatment provider for many individuals with mental illness, and the majority of jail inmates suffer from a mental health condition. *See* National Conference of State Legislatures, Mental Health Needs in the Criminal Justice System (May 1, 2017), http://www.ncsl.org/research/civil-and-criminal-justice/mental-health-needs-of-criminal-justice.aspx. In spite of this reality, our police forces are often woefully ill-equipped to safely address the presenting issue or the ongoing needs of these individuals. *See* Norm Ornstein & Steve Leifman, *How Mental-Health Training for Police Can Saves Lives—and Taxpayer Dollars*, The Atlantic (Aug. 11, 2017), https://www.theatlantic.com/politics/archive/2017/08/how-mental-health-training-for-police-can-save-livesand-taxpayer-dollars/536520/.

Our failure as a society to adequately address the treatment of mental health problems routinely leaves these problems to be addressed through the criminal justice system. But the laws governing crime are a poor fit for the reality of dealing with mental health issues, perhaps because the selection of law enforcement officers and their training occupies so little common ground with the selection and training of those who treat mental health issues. And then we add the layer of qualified immunity that excuses "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). This over-thickening shield does little to force society to reconsider the propriety of leaving mental health issues in the hands of police officers untrained to handle them. At least two members of the Supreme Court have concluded that the recurring grant of qualified immunity in these incidents sends the wrong message to law enforcement officers and "tells the public that palpably unreasonable conduct will go unpunished." *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J. dissenting). In addressing these

events, I think we have embarked on the wrong road and the place to which it leads will prove

detrimental to law enforcement, those with mental health issues, and our society as a whole.

"Because there is nothing right or just under the law about this, I respectfully dissent." *Id.*