NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0517n.06
Case No. 21-3027

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LATRENT REDRICK; JAMON PRUIETT,

    Plaintiffs-Appellees,

v.

CITY OF AKRON, OHIO,

    Defendant,

JOHN TURNURE,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Nov 15, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**O P I N I O N**

Before: SUTTON, Chief Judge; McKEAGUE and WHITE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Akron police officer John Turnure appeals the district court's denial of his motion for summary judgment based on qualified immunity. Turnure shot Latrent Redrick and Jamon Pruiett six times each. Redrick and Pruiett brought § 1983 claims alleging unlawful seizure and state-law claims for negligence and assault and battery, among others. The district court held that disputes of material fact preclude summary judgment on these claims. For the reasons that follow, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

## I. Facts

Brothers Latrent Redrick and Jamon Pruiett were celebrating Redrick's twenty-first birthday in Akron, Ohio on October 1, 2017. The brothers and their friends were ordering food late in the night at a stand outside of Zar Nightclub when a fight broke out nearby. City of Akron police officers instructed those in the vicinity, including Redrick and Pruiett, to move across the street away from the fight. Akron police officers John Turnure and Utomhin Okoh were stationed near the nightclub in a police cruiser. Officer Al Jones was nearby on the street when the fight broke out.

As Redrick, Pruiett, and a friend of theirs walked toward their car to go home, a group of men bumped into the friend. Many of the men wore hoods tied tightly around their faces ostensibly to obscure their identities. The men threatened Redrick, Pruiett, and their friend with physical violence. The brothers feared they would be harmed. Redrick possessed a Carrying Concealed Weapon (CCW) license and was carrying his gun in his pocket.

At this point, the accounts of what happened diverge. Video, but not audio, of the events was partially captured by a surveillance camera from a nearby Goodwill boutique. The parties dispute the extent to which the video proves their version of the events.

### A. Redrick and Pruiett's Account

According to Redrick, when the group threatened them, he announced that he had a weapon and showed it to the group to deescalate the situation, pursuant to his CCW training. He did so by lifting the butt of his gun partially out of his pocket and saying, "I have a license to carry, CCW, get back." R. 19-1, P. 116. After that, many of the men in the group dispersed. He claims that he did not point the gun at anyone, he never raised the gun, and in fact never pulled the gun fully out of his pocket. The testimony of Pruiett, Joseph Brantley (one of the brothers' friends who was at

- 2 -

the scene), and Officer Jones all confirm that they never saw Redrick pull out his gun, point it at anyone, or brandish it in any way. Redrick asserts that he never intended to use the gun and his purpose in showing and announcing the weapon was de-escalation. Redrick, Pruiett, and their friend kept walking down the sidewalk toward their car. Redrick's hand was on the butt of his gun. Redrick says he did not know a police officer was behind him. Redrick and Pruiett maintain that Turnure never gave any commands for Redrick to drop the gun. Officer Jones, who was roughly five to ten feet from Redrick, testified that he never heard anyone yell, "drop the gun." The surveillance video does not show anyone turning to look in Turnure's direction at the time he was allegedly screaming commands to drop the gun. Turnure fired his gun at Redrick from behind. As Turnure shot Redrick in the back, Redrick's elbow jerked up and the gun flew out of his hand. After the gun was out of Redrick's hand, Turnure continued to shoot.

Pruiett testified that, as Redrick was being shot, he saw the gun come out of Redrick's hand. He thought his brother was dead and that he, too, was going to die. Not knowing who was shooting and thinking it was the group of threatening men, he crouched down and reached for the gun, pulling it to his chest. Turnure began shooting at Pruiett and shot him multiple times. Pruiett then, assertedly without knowing who was firing at him, shot once in Turnure's direction. The gunshots ceased. Each brother was shot six times.

### B. Turnure's Account

According to Turnure, he was in his police cruiser when he looked across the street and saw a person "with an outstretched arm, with a gun in his hand, pointing it at people on the sidewalk." R. 23-9, P. 322. The testimony of Officer Okoh, Turnure's partner that night, agrees. Turnure exited the police cruiser and walked toward Redrick. Turnure saw another Akron police officer, Al Jones, walking across the street toward Redrick as well. Jones did not appear to see

that Redrick was armed, and so Turnure contends that he screamed repeatedly, "Gun, gun. Guy's got a gun." R.23-9, P. 318. Turnure made his way across the street and positioned himself behind Redrick with his gun drawn and pointing at Redrick. He saw Redrick with the gun at his side. He claims that he screamed, "Drop the gun. Drop the gun. Drop the gun." R. 23-9, P. 319. Then, Turnure saw the gun "separate[] from his body in a manner." *Id.* Turnure fired into Redrick's back. He continued to fire until the gun was no longer in Redrick's possession. Then, Pruiett "dove for the pistol." *Id.* Turnure fired at Pruiett. Pruiett fired back.

## C. Procedural History

Redrick and Pruiett filed federal claims under 42 U.S.C. § 1983 and state-law claims against the police officers and the City of Akron. The officers and the city filed a motion for summary judgment, asserting the defenses of qualified immunity and Ohio statutory immunity, among others. When the district court considered the motion for summary judgment, only three claims remained, all against Officer Turnure: unconstitutional seizure, negligence, and assault and battery. The district court denied Turnure immunity on summary judgment based on the existence of genuine disputes of material fact. Turnure appeals.[1]

## II. Standard of Review

We review the district court's denial of summary judgment de novo. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). In doing so, when there is video evidence, we view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). But if the video "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d

---

[1] Neither party contests that we have jurisdiction in this case. The parties raise legal issues as well as factual issues, and so we have jurisdiction to review. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).

541, 547 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)). Viewing the facts in this manner, if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56.

### III.  Qualified Immunity

Qualified immunity is available to public officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis has two components: (1) whether a constitutional violation occurred, and (2) whether the law was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). We have discretion to consider those two elements in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the right is not clearly established, we may decline to reach the constitutional question. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The touchstone of the clearly established prong is whether an official had "fair warning" of the illegality of his actions. *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). This inquiry "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741; *see also Rivas-Villegas v. Cortesluna*, No. 20-1539, 2021 WL 4822662, at *2–3 (U.S. Oct. 18, 2021); *City of Tahlequah v. Bond*, No. 20-1668, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021). Therefore, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).

Viewing the facts in light of the video and construing the evidence in the manner most favorable to the plaintiffs, disputes of material fact preclude summary judgment to Turnure on Redrick's claims. But there is no clearly established law that places the unconstitutionality of utilizing deadly force against Pruiett beyond debate. Thus, we reverse the district court's denial of qualified immunity as to Pruiett's § 1983 claim but affirm the district court as to Redrick's § 1983 claim and both plaintiffs' state-law claims.

## IV. Redrick's Claims

### A. Fourth Amendment Claim

#### 1. Constitutional Violation

Redrick claims that Turnure violated his right to be free from excessive force under the Fourth Amendment. In assessing whether a constitutional violation has occurred, we undertake a "fact-specific, case-by-case inquiry," considering whether the force used was reasonable "from the perspective of the reasonable official on the scene." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 598 (6th Cir. 2012) (quotation omitted). Reasonableness in the context of deadly force is a totality-of-the-circumstances inquiry, based on the three *Graham* factors: (1) the severity of the crime at issue, (2) active resistance to law enforcement, and (3) whether the suspect posed an immediate threat to the safety of officers or others. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The immediate threat factor is a "minimum requirement for the use of deadly force." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009). And if it is feasible to give a warning before resorting to lethal force, an officer must do so. *Tenn. v. Garner*, 471 U.S. 1, 11–12 (1985). Still, our inquiry "contains a built-in measure of deference to the officer's on-the-spot judgment." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002); *Graham*, 490 U.S. at 396–97 (cautioning courts not to look with "the 20/20

vision of hindsight" and to be mindful that officers face "tense, uncertain, and rapidly evolving" situations).

### a. Severity of the Crime and Active Resistance

Here, when viewing the facts in the light most favorable to Redrick, the first two *Graham* factors do not support the use of deadly force. On the first factor (severity of the crime), Turnure argues that he had probable cause to believe Redrick was committing a severe crime because he observed Redrick "show" his gun. But it is legal to carry a gun in Ohio. *See* Ohio Rev. Code § 2923.12. Redrick was licensed to carry a concealed weapon. And although Turnure claims Redrick raised his gun to shoulder height and pointed it at the group in front of him, Redrick's account differs. Redrick maintains that he never raised his gun to shoulder height and instead that he pulled only the butt of his gun out of his pocket to reveal that he possessed a weapon and thus diffuse the situation, pursuant to his CCW training. Accepting Redrick's account, as we must on summary judgment, Redrick did not commit any crime at all, much less one that would justify deadly force. *See Anderson*, 477 U.S. at 255. Turnure attempts to rely on Redrick's later conviction for inducing panic and indictment for felonious assault to support his argument.[2] But the reasonableness of an officer's actions is limited to what the officer could have known at the time. *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). Turnure could not have known about a subsequent indictment and conviction at the time he shot Redrick. Thus, Turnure cannot rely on the severity of any crime to justify his use of force.

On the second factor (active resistance), the facts are again disputed. Turnure contends that he gave commands for Redrick to drop his gun, and that Redrick refused those commands. Redrick claims that no such commands were given, and he was not aware of officers' presence

---

[2] Facing multiple felony charges, Redrick accepted a plea deal for misdemeanor inducing panic. R. 23-4, P. 207–08.

behind him at all. The surveillance video has no audio and so it does not resolve the dispute. Construing the evidence in the light most favorable to Redrick, we assume Turnure did not issue any commands, and therefore that Redrick was not resisting. *See Anderson*, 477 U.S. at 255; *Baker v. Union Twp.*, 587 F. App'x 229, 235–36 (6th Cir. 2014) ("[B]ecause [the officer] gave no warnings and issued no commands once inside the house, it would have been impossible for [the plaintiff] to resist at this time."). But even if commands were given, mere noncompliance with an officer's command does not constitute active resistance. *Eldridge v. Warren*, 533 F. App'x. 529, 535 (6th Cir. 2013) ("[N]oncompliance alone does not indicate active resistance; there must be something more.").

### b. Immediate Threat

That leaves us with the third factor: whether Redrick posed an immediate threat to officers or others. Turnure argues that Redrick posed an immediate threat because he "show[ed]" his gun, "advance[d]" toward individuals on the sidewalk, did not respond to commands to drop the gun, and then made a movement to raise his gun. R. 23-9, P. 318–19.

As discussed above, the nature of Redrick "showing" his gun is disputed, as is whether Turnure gave any command or warning to drop the gun. That leaves Redrick's alleged movement to raise the gun as the crucial evidence in support of the assertion that Redrick posed an immediate threat. Contrary to Turnure's argument, the video evidence is inconclusive regarding whether Redrick made any movement to raise his gun. The video does not show any definitive movement of Redrick's hand prior to him being shot in the back. Watching the video in real time, it appears that Redrick was simply holding the gun in his pocket or at his side while walking down the sidewalk when he was shot in the back. Redrick stands firm that he was not making any movement

to raise his gun. A reasonable jury viewing the video could resolve the dispute in favor of either party.

Therefore, we draw the inferences for purposes of this appeal (1) that Redrick was not raising his gun, and that it was instead in his pocket or at his side prior to his being shot, and (2) that Turnure never gave Redrick any commands to drop his weapon before shooting him. Under this version of the facts, Turnure's actions were unreasonable.

Redrick was in lawful possession of a firearm, which he kept at his side. But mere possession of a weapon without more is insufficient to justify deadly force. *See Bouggess*, 482 F.3d at 896 ("[E]ven when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified."); *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) ("[W]e do not hold that an officer may shoot a suspect merely because he has a gun in his hand."). Although it is not necessary that a gun be pointed at another person for deadly force to be justified, there must be some indication that the possessor of a weapon is willing to and is about to use the weapon to harm officers or others. *See Bouggess*, 482 F.3d at 896; *Bletz v. Gribble*, 641 F.3d 743, 753–54 (6th Cir. 2011) (unreasonable to shoot when suspect had a gun in his hands but "there was no imputation of past or potential future violence on the part of [the suspect]" and the suspect was complying with police commands); *Brandenburg v. Cureton*, 882 F.2d 211, 213, 215 (6th Cir. 1989) (unreasonable to shoot a suspect who previously threatened violence to officers but was not pointing his gun at the officer or others).

And where it is feasible, non-lethal means must be utilized before resorting to deadly force. *Garner*, 471 U.S. at 11–12; *see also Thomas*, 854 F.3d at 366–67; *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996). For example, in *Yates v. City of Cleveland*, we held that it was

unreasonable for an officer who entered a home late at night to shoot without identifying himself when confronted with a suspect who did not pose an immediate threat. 941 F.2d 444, 447 (6th Cir. 1991). In contrast, in *Chappell v. City of Cleveland*, we held that it was reasonable to shoot without warning when the suspect was "quickly advancing toward the officers while holding [a] knife up and refusing to drop it." 585 F.3d at 915.

Here, Turnure was in position behind Redrick as he walked down the sidewalk with his lawfully carried gun in his pocket or at his side. In these circumstances, Turnure's failure to warn Redrick to drop his weapon before shooting was unreasonable. Without any other facts indicating an immediate danger beyond possession of a lawful firearm, it was feasible to attempt non-lethal means of deescalating the situation. Turnure could have ordered Redrick to drop the gun. If a jury finds those warnings were given and ignored, this may be a different case. But if the need for deadly force could have been obviated by a simple command to drop the weapon and the officer failed to attempt such less-than-lethal means, deadly force was unreasonable.

### 2. Clearly Established

Accepting Redrick's account of the facts, Turnure violated Redrick's clearly established rights when he shot him six times from behind without warning and without any indication that Redrick would use his lawfully carried gun to harm officers or others. *See Garner*, 471 U.S. at 7, 11–12 (deadly force is unreasonable unless the suspect poses an immediate threat of harm and, if feasible, a warning has been given). In general, cases like *Graham* and *Garner* cannot clearly establish a constitutional violation because they are "cast 'at a high level of generality.'" *Cortesluna*, 2021 WL 4822662 at *2 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). But "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199. Under Redrick's facts, this is a case where no

reasonable officer could believe deadly force was justified. *See Garner*, 471 U.S. at 7, 11–12. And beyond that, a body of relevant case law from this Circuit supports the denial of qualified immunity here. *See David v. City of Bellevue*, 706 F. App'x 847, 852 (6th Cir. 2017) (denying qualified immunity when there was a dispute of fact whether suspect had his firearm raised); *Brandenburg*, 882 F.2d at 215–216 (same); *Dickerson*, 101 F.3d at 1154, 1163 (denying qualified immunity when officers shot a man who had fired nine shots inside his home and made verbal threats but at that moment was simply "walk[ing] slowly toward his front door . . . his arms down by his sides"); *King v. Taylor*, 694 F.3d 650, 653, 663–64 (6th Cir. 2012) (denying qualified immunity when officers shot a man who had threatened to kill someone but had his gun "resting on his right hip" while lying on the couch); *Bletz*, 641 F.3d at 752 (denying qualified immunity when suspect was lowering his gun when he was shot); *Cf. Thornton v. City of Columbus*, 727 F. App'x 829, 831, 837–38 (6th Cir. 2018) (granting qualified immunity when officer shot a man who threatened neighbor children with a gun and was walking toward officers looking right at them with his gun pointed "upward and slightly to [the officer's] right" and failing to comply with commands). Therefore, summary judgment is inappropriate.

## B. State Claims

Redrick asserts an assault and battery claim and a negligence claim against Turnure under Ohio state law. Ohio provides a form of statutory immunity to state employees unless they acted "outside the scope of the employee's employment" or "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(a)–(b). We have held that "[w]hen federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'" *Wright v. City of Euclid*, 962

F.3d 852, 878 (6th Cir. 2020) (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018)). For the same reasons and disputed facts relevant to Redrick's § 1983 claim that compel us to find Turnure's shooting Redrick was objectively unreasonable, a jury could find that Turnure acted in a wanton or reckless manner or with malicious purpose.[3] So, state statutory immunity is unavailable to Turnure on summary judgment.

## V. Pruiett's Claims

Pruiett also claims that Turnure violated his Fourth Amendment rights by shooting him. Holding that using deadly force against Redrick was unreasonable does not dictate that shooting Pruiett was likewise unreasonable. *See Los Angeles v. Mendez*, 137 S.Ct. 1539, 1544 (2017) ("A different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure."); *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406–07 (6th Cir. 2007). But we need not reach the constitutionality of Turnure's actions as related to Pruiett because the law in these circumstances was not clearly established.

### A. Fourth Amendment Claim

When the shooting occurred, case law did not clearly establish that Turnure's use of deadly force against Pruiett was unconstitutional. *See Ashcroft*, 563 U.S. at 741; *Cortesluna*, 2021 WL 4822662, at *3; *City of Tahlequah*, 2021 WL 4822664, at *2. The situation was unfolding rapidly. Amidst gunfire, Redrick's firearm came out of his hand and Pruiett lunged for it. This quick movement toward a deadly weapon in the heat of gunfire is different from Redrick's simply holding a lawful weapon at his side. Because Pruiett was grabbing for the gun, the immediacy of the situation makes it less feasible that less-than-lethal force, *i.e.* giving commands to drop the gun, would have sufficed. There was no clearly established law from the Supreme Court or this

---

[3] After the shooting stopped, Turnure walked over to where Redrick and Pruiett lay on the sidewalk. Redrick said, "pick me up, please." Turnure responded, "f*** you," as confirmed by his own testimony. R. 23-9, P. 338.

Circuit that would have informed Turnure that using deadly force against a suspect who lunged for a weapon amidst a dangerous altercation was unlawful.

Plaintiffs cite *Bouggess v. Mattingly* to argue that having and holding a weapon is not enough to make deadly force reasonable, but that case does not squarely govern the facts before us. 482 F.3d at 896. More than mere possession of a weapon, Pruiett made a quick movement to grab the gun as his brother was being fired upon. The immediacy of that movement—and the inference that could reasonably be drawn regarding what a person might do with a gun after they grab it during a gunfight—is a material factual difference between this case and those referenced in Redrick's analysis that may otherwise clearly establish the law.

## B. State Claims

Although Ohio statutory immunity often fails when federal qualified immunity is denied, the same is not necessarily true in reverse. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (citing *Chappell*, 585 F.3d at 916 n.3) (stating that "officers may be entitled to state-law immunity if qualified immunity shields them from liability on federal claims"); *see also Wilson v. Gregory*, 3 F.4th 844, 860 (6th Cir. 2021) ("But in this case, our federal qualified immunity analysis turns on the 'clearly established' prong. As a result, 'the availability of both federal qualified immunity and state law immunity' does not entirely 'depend[] on the correctness of the district court's finding of the existence of the very same questions of fact' because Ohio statutory immunity does not turn on whether a particular right was clearly established.") (quoting *Chappell*, 585 F.3d at 907 n.1, 916 n.3). The statute contains no explicit "clearly established" law requirement. *See* Ohio Rev. Code § 2744.03. Because Turnure's qualified immunity defense is granted here on "clearly established" grounds and we do not decide the constitutionality of his conduct in relation to Pruiett, the state-law claims are not foreclosed. A reasonable jury could find

that Turnure acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" when he shot Pruiett after Pruiett picked up the gun but before he ever fired a shot, especially considering this incident was precipitated by his unconstitutional shooting of Redrick. Ohio Rev. Code § 2744.03(A)(6)(a); *see King v. City of Columbus*, No. 2:18-CV-1060, 2021 WL 3367507, at *5, *8 (S.D. Ohio Aug. 3, 2021) (denying statutory immunity because a jury could find that an officer's use of deadly force was wanton and reckless when the suspect had a gun but did not pose a threat to officers). Therefore, summary judgment as to Pruiett's state-law claims is inappropriate.

## VI. Conclusion

For these reasons, we AFFIRM the district court's denial of summary judgment to Turnure as to Redrick's federal and state claims and as to Pruiett's state claims, REVERSE the district court's denial as to Pruiett's federal claim, and REMAND to the district court for further proceedings consistent with this opinion.